Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE TRAN, derivatively on behalf of ALIGN TECHNOLOGY, INC., | |
| Plaintiff, | Case No.: |
| vs. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| JOSEPH M. HOGAN, JOHN F. MORICI, RAPHAEL S. PASCAUD, KEVIN J. DALLAS, JOSEPH LACOB, C. RAYMOND LARKIN, JR., GEORGE J. MORROW, THOMAS M. PRESCOTT, ANDREA L. SAIA, GREG J. SANTORA, SUSAN E. SIEGEL, and WARREN S. THALER, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| ALIGN TECHNOLOGY, INC., | |
| Nominal Defendant. | |

### <u>INTRODUCTION</u>

Plaintiff Michelle Tran ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Align Technology, Inc. ("Align" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Joseph M. Hogan, John F. Morici, Raphael S. Pascaud, Kevin J. Dallas, Joseph Lacob, C. Raymond Larkin, Jr., George J. Morrow, Thomas M. Prescott,

Andrea L. Saia, Greg J. Santora, Susan E. Siegel, and Warren S. Thaler (collectively, the "Individual Defendants" and together with Align, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Align, unjust enrichment, waste of corporate assets, and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Align, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Align's directors and officers from April 25, 2018 through the present (the "Relevant Period").

2. Align, founded in 1997, designs, manufactures, and markets a system of clear dental aligner therapy, intraoral scanners, and computer-aided design and computer-aided manufacturing digital services. Its most recognizable product is its line of clear dental aligners marketed under the brand name Invisalign®.

3. One of the metrics the Company uses to track its financials is the average selling price ("ASP") of its products.

4. During the Relevant Period, the Individual Defendants made, and caused the Company to make, positive statements about ASP growth.

5.      However, the Individual Defendants failed, and caused the Company to fail, to disclose that it made adjustments to its Advantage Program for doctors at beginning of 2018 that resulted in higher discount rates, and, during the Relevant Period engaged in certain untested promotions that, together, would undermine and reverse this ASP growth.

6.      On October 24, 2018, the Company issued a press release announcing its financial results for the quarter ended September 30, 2018, and certain of the Individual Defendants held a conference call with analysts and investors to discuss the same financial results.

7.      The press release and conference call revealed to the market that the Company had made changes to its North American Advantage Program at the beginning of fiscal 2018, and in the quarter ended September 30, 2018 ("Q3 2018") had initiated a new product promotion for Invisalign.

8.      It was also revealed that, as a result of these promotions and other factors, ASP had declined $85 in Q3 2018, annihilating the $5 quarter over quarter gains achieved in each of the quarters ended March 31 and June 30, 2018.

9.      On this news, the price per share of Align's stock declined from a closing price of $290.83 per share on October 24, 2018 to close at $232.07 per share on October 25, 2018 -- a drop of over 20%, or $58.76.

10.     The price per share of Align's stock continued to decline over the next two trading days to close at $217.94 per share on October 29, 2018.

11.     During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

12.     During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Align, willfully or recklessly made and/or caused the Company to make false and/or misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose

that: (1) the Company changed its customer loyalty Advantage Program in North America at the beginning of fiscal year 2018, resulting in higher discounts for doctors; (2) the Company initiated a new promotion in Q3 2018 related to Invisalign, which was distinct from previous promotions, and therefore untested; (3) as a result of the foregoing, the Company's ASP would decline, diminishing net income and profit margins; (4) the Company failed to maintain internal controls; and (5) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

13.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

14.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain internal controls.

15.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations while nine of them engaged in insider sales, netting proceeds of approximately $53.3 million. Approximately 425,891 shares of the Company's common stock were repurchased between July 1, 2018 and August 31, 2018 for approximately $150 million. As the Company's stock was actually only worth $217.94 per share, the price at which it was trading when markets closed on October 29, 2018, the Company overpaid approximately $57.2 million in total.

16.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, its Chief Executive Officer ("CEO"), and its Senior Vice President, Global Finance and Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in this District, and the Company, its CEO, its Senior Vice President, Global Finance and CFO, and its Chief Marketing Officer ("CMO") to a second federal securities fraud class action lawsuit pending in this

District (together, the "Securities Class Actions"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company and who received proceeds of insider sales, and is costing the Company millions of dollars.

17.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     Venue is proper in this District because Align is headquartered in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the

Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

**Plaintiff**

23.     Plaintiff is a current shareholder of Align. Plaintiff has continuously held Align common stock at all relevant times.

**Nominal Defendant Align**

24.     Align is a Delaware corporation with its principal executive offices at 2820 Orchard Parkway, San Jose, California. Align's stock trade on the NASDAQ under the ticker symbol "ALGN."

**Defendant Hogan**

25.     Defendant Joseph M. Hogan ("Hogan") has served as Align's President and CEO, and as a member of its Board, since 2015. According to the Company's Schedule 14A filed with the SEC on April 5, 2018 (the "2018 Proxy Statement"), as of March 21, 2018, Defendant Hogan beneficially owned 51,711 shares of the Company's common stock.[1] Given that the price per share of the Company's common stock at the close of trading on March 21, 2018 was $270.14, Hogan owned approximately $14 million worth of Align stock.

26.     For the fiscal year ended December 31, 2017, Defendant Hogan received $11,744,047 in compensation from the Company. This included $998,077 in salary, $7,118,945 in stock awards, $3.6 million in non-equity incentive plan compensation, and $27,025 in all other compensation.

27.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Hogan made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|

---

[1] This figure includes 1,500 shares held by a member of Defendant Hogan's household.

6
Verified Shareholder Derivative Complaint

| August 14, 2018 | 25,000 | $ 367.48 | $ 9,186,990 |

Thus, in total, before the fraud was exposed, he sold 25,000 Company shares on inside information, for which he received approximately $9.2 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

28.     The Company's 2018 Proxy Statement stated the following about Defendant Hogan:

Mr. Hogan has served as our President and Chief Executive Officer and a member of our Board since June 2015. Prior to joining us, Mr. Hogan was Chief Executive Officer of ABB Ltd., a global power and automation technologies company based in Zurich, Switzerland, from 2008 to 2013. Prior to ABB, Mr. Hogan worked at General Electric Company (GE) in a variety of executive and management roles from 1985 to 2008, including eight years as Chief Executive Officer of GE Healthcare from 2000 to 2008. Mr. Hogan earned a MSBA from Robert Morris University and a B.S. in Business Administration from Geneva College.

29.     Upon information and belief, Defendant Hogan is a citizen of the State of California.

**Defendant Morici**

30.     Defendant John F. Morici ("Morici") has served as Align's Senior Vice President, Global Finance and CFO since 2016. According to the 2018 Proxy Statement, as of March 21, 2018, Defendant Morici beneficially owned 2,919 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 21, 2018 was $270.14, Morici owned approximately $788,539 worth of Align stock.

31.     For the fiscal year ended December 31, 2017, Defendant Morici received $3,824,959 in compensation from the Company. This included $425,846 in salary, $2,742,889 in stock awards, $616,320 in non-equity incentive plan compensation, and $39,904 in all other compensation.

32.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Morici made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| May 30, 2018 | 2,405 | $ 331.35 | $ 796,908 |

Thus, in total, before the fraud was exposed, he sold 2,405 Company shares on inside information, for which he received approximately $796,908. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

33.     The Company's website states the following about Defendant Morici:[2]

John Morici joined Align Technology as Chief Financial Officer (CFO) in November 2016 and is responsible for managing the company's global finance and financial strategy. Over his more than 20-year career, Mr. Morici has held senior leadership positions in finance, operations and strategic planning in healthcare, medical technology and consumer/entertainment. Prior to joining Align, Mr. Morici spent nine years at NBC Universal where he held several senior management positions in the company's Universal Pictures Home Entertainment U.S. and Canadian business, including chief financial officer, chief operating officer, and most recently, executive vice president and managing director. In his role as Executive Vice President and Managing Director, Mr. Morici led all finance, sales, marketing, operations and customer service organizations and was responsible for overall strategy and planning. Prior to NBC Universal, Mr. Morici spent eight years in senior financial management positions at GE Healthcare, including as CFO for its Diagnostic Imaging and Global Products units. He also held a number of financial management roles during his tenure at Case New Holland and Abbott Laboratories. Mr. Morici earned an M.B.A. degree in Finance and a B.S. degree with Honors in Molecular Biology from the University of Wisconsin.

34.     Upon information and belief, Defendant Morici is a citizen of the State of California.

**Defendant Pascaud**

35.     Defendant Raphael S. Pascaud ("Pascaud") has served as the Company's CMO since 2016. On October 24, 2018, the Company announced that Defendant Pascaud had "decided to reduce his responsibilities and transition to a part-time position to spend more time with his family." As clarified by Defendant Hogan on an October 24, 2018 conference call, Defendant Pascaud will remain the Company's CMO until a successor is appointed. According to the 2018 Proxy Statement, as of March 21, 2018,

---

[2] http://investor.aligntech.com/company-information/management. Last visited December 19, 2018.

Defendant Pascaud beneficially owned 35,587 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 21, 2018 was $270.14, Pascaud owned over $9.6 million worth of Align stock.

36.     For the fiscal year ended December 31, 2017, Defendant Pascaud received $2,647,959 in compensation from the Company. This included $386,000 in salary, $1,688,3778 in stock awards, $555,500 in non-equity incentive plan compensation, and $18,081 in all other compensation.

37.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Pascaud made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
| --- | --- | --- | --- |
| August 23, 2018 | 10,500 | $   361.00 | $ 3,790,500 |

Thus, in total, before the fraud was exposed, he sold 10,500 Company shares on inside information, for which he received approximately $3.8 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

38.     The Company's website states the following about Defendant Pascaud:[3]

Raphael Pascaud is Chief Marketing Officer and Senior Vice President, Product Portfolio and Business Development with global marketing responsibility of Align's product portfolio including the Invisalign and iTero product brands as well as overseeing the business development function. He joined the company in 2010 originally as Vice President and Managing Director for the EMEA region. Over his tenure, Mr. Pascaud increased his regional responsibilities and was promoted to Vice President, International in January 2014. In July 2015, he was promoted to Chief Marketing, Portfolio and Business Development Officer assuming global marketing responsibility for the Company's Invisalign product portfolio initially, including product management and commercialization of product roadmap and then adding the iTero product portfolio a year later in 2016. Prior to joining Align Technology, Mr. Pascaud spent 14 years in various management positions within DePuy International, (Johnson & Johnson family of companies), including Vice President Orthopedics of EMEA and Vice President Marketing

---

[3] http://investor.aligntech.com/company-information/management. Last visited December 19, 2018.

of International. Mr. Pascaud has extensive experience in multinational organizational management, international sales strategy, and global professional and consumer marketing within the medical device sector. Mr. Pascaud holds a Ph.D. in Bioengineering and received his undergraduate degree in Mechanical Engineering from the University of Glamorgan, Cardiff, Wales.

**Defendant Dallas**

39.     Defendant Kevin J. Dallas ("Dallas") has served as a member of Align's Board since March 2018.

40.     The Company's 2018 Proxy Statement stated the following about Defendant Dallas:

Kevin J. Dallas has served as a director of Align Technology, Inc. since March 2018. In his current role at Microsoft Corporation (NASDAQ: MSFT), Mr. Dallas is Corporate Vice President, Artificial Intelligence & Intelligent Cloud Business Development. At Microsoft, his team creates partnerships that help enable the digital transformation of customers and partners across a range of industries including: connected/autonomous vehicles, industrial IoT, discrete manufacturing, retail, financial services, media and entertainment, and healthcare. With advanced technologies that include intelligent cloud and intelligent edge services, Microsoft enables business outcomes that include: transforming products, optimizing operations, empowering employees, and enhancing customer engagement. Prior to joining Microsoft in 1996, Mr. Dallas held roles at NVIDIA Corporation and National Semiconductor (now Texas Instruments Inc.) in the U.S., Europe and the Middle East in roles that included microprocessor design, systems engineering, product management, and end-to-end business leadership. He holds an Executive M.B.A. from the Kellogg School of Management at Northwestern University, and a B.S. degree in Computer Science from Staffordshire University, Stoke-on-Trent, Staffordshire, England.

**Defendant Lacob**

41.     Defendant Joseph Lacob ("Lacob") has served as a member of the Company's Board since 1997. According to the 2018 Proxy Statement, as of March 21, 2018, Defendant Lacob beneficially owned 309,319 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 21, 2018 was $270.14, Lacob owned approximately $83.6 million worth of Align stock.

42.     For the fiscal year ended December 31, 2017, Defendant Lacob received $488,889 in compensation from the Company, comprised of $65,000 in fees earned or paid in cash and $423,889 in stock awards.

43.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Lacob made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| May 11, 2018 | 9,432 | $ 285.78 | $ 2,695,518 |
| May 11, 2018 | 568 | $ 286.45 | $    162,701 |
| May 14, 2018 | 10,000 | $ 293.00 | $ 2,930,000 |
| May 31, 2018 | 10,000 | $ 332.38 | $ 3,323,750 |
| August 27, 2018 | 10,000 | $ 382.00 | $ 3,820,013 |

Thus, in total, before the fraud was exposed, he sold 40,000 Company shares on inside information, for which he received over $12.9 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

44.     The Company's 2018 Proxy Statement stated the following about Defendant Lacob:

Mr. Lacob has served as a director of Align since August 1997 and has been a partner of Kleiner Perkins Caufield & Byers (KPCB), a venture capital firm, since May 1987. In 2011, Mr. Lacob acquired The Golden State Warriors of the National Basketball Association. He is currently the Managing Partner and CEO of the Warriors. Prior to joining KPCB in 1987, Mr. Lacob was an executive with Cetus Corporation (now Chiron), FHP International, a health maintenance organization, and the management consulting firm of Booz, Allen & Hamilton. He was previously on the board of directors of Orexigen Therapeutics, a biopharmaceutical company focused on the development of pharmaceutical product candidates for the treatment of obesity. Mr. Lacob received his B.S. in Biological Sciences from the University of California at Irvine, his Masters in Public Health from the University of California at Los Angeles and his M.B.A. from Stanford University.

45.     Upon information and belief, Defendant Lacob is a citizen of the State of California.

**Defendant Larkin**

46.     Defendant C. Raymond Larkin, Jr. ("Larkin") has served as a Company director since 2004, and as its Chairman of the Board since 2006. According to the 2018 Proxy Statement, as of March 21, 2018, Defendant Larkin beneficially owned 102,266 shares of the Company's common stock. Given

that the price per share of the Company's common stock at the close of trading on March 21, 2018 was $270.14, Larkin owned over $27.6 million worth of Align stock.

47.     For the fiscal year ended December 31, 2017, Defendant Larkin received $801,132 in compensation from the Company, comprised of $210,000 in fees earned or paid in cash and $591,132 in stock awards.

48.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Larkin made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| May 7, 2018 | 1,500 | $ 264.45 | $ 396,675 |

Thus, in total, before the fraud was exposed, he sold 1,500 shares of Company stock on inside information, for which he received approximately $396,675. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

49.     The Company's 2018 Proxy Statement stated the following about Defendant Larkin:

Mr. Larkin has served as a director of Align since March 2004. In February 2006, Mr. Larkin was appointed as Chairman of the Board. He currently is a Principal of Group Outcome L.L.C., a merchant banking firm concentrating on medical technologies. From 2001 to 2007, he served as a part time Venture Partner at Cutlass Capital, a venture capital firm. Mr. Larkin was previously Chairman and Chief Executive Officer at Eunoe, Inc., a medical device company. From 1983 to March 1998, he held various executive positions with Nellcor Puritan Bennett, Inc., a medical instrumentation company, for which he served as President and Chief Executive Officer from 1989 until 1998. Mr. Larkin also held various positions of increasing responsibility at Bentley Laboratories/American Hospital Supply from 1976 to 1983. He serves on the board of directors of Heartware, Inc., a medical device company developing implant devices for the treatment of advanced heart failure. Mr. Larkin received his B.S. in Industrial Management from LaSalle University.

50.     Upon information and belief, Defendant Larkin is a citizen of the State of California.

**Defendant Morrow**

51.     Defendant George J. Morrow ("Morrow") has served as a Company director since 2006, and is the Chair of the Compensation Committee. According to the 2018 Proxy Statement, as of March 21, 2018, Defendant Morrow beneficially owned 54,515 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 21, 2018 was $270.14, Morrow owned over $14.7 million worth of Align stock.

52.     For the fiscal year ended December 31, 2017, Defendant Morrow received $503,806 in compensation from the Company, comprised of $79,917 in fees earned or paid in cash and $423,889 in stock awards.

53.     The Company's 2018 Proxy Statement stated the following about Defendant Morrow:

Mr. Morrow has served as a director of Align since February 2006. From February 2011 until January 2013, Mr. Morrow served as a consultant to Amgen Inc., a global biotechnology company. From 2003 until his retirement in February 2011, he was the Executive Vice President, Global Commercial Operations at Amgen Inc., where he also served as Executive Vice President of Worldwide Sales and Marketing between 2001 and 2003. From 1992 to 2001, Mr. Morrow held multiple leadership positions at GlaxoSmithKline Inc. and its subsidiaries, including President and Chief Executive Officer of Glaxo Wellcome Inc. He is a member of the board of directors of Vical Incorporated, a company that researches and develops biopharmaceutical products, Otonomy, Inc., a clinical-stage biopharmaceutical company focused on the development and commercialization of innovative therapeutics for diseases and disorders of the inner and middle ear and Neurocrine Biosciences, a biotechnology company focused on neurologic, psychiatric and endocrine related disorders. He was on the board of Safeway Inc., a food and drug retailer from May 2013 until February 2015. Mr. Morrow holds a B.S. in Chemistry from Southampton College, Long Island University, an M.S. in Biochemistry from Bryn Mawr College and an M.B.A. from Duke University.

**Defendant Prescott**

54.     Defendant Thomas M. Prescott ("Prescott") has served as a Company director since 2002. From 2002 to 2015 he served as Align's President and CEO. According to the 2018 Proxy Statement, as of March 21, 2018, Defendant Prescott beneficially owned 242,439 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 21, 2018 was $270.14, Prescott owned approximately $65.5 million worth of Align stock.

Verified Shareholder Derivative Complaint

55.    For the fiscal year ended December 31, 2017, Defendant Prescott received $478,889 in compensation from the Company, comprised of $55,000 in fees earned or paid in cash and $423,889 in stock awards.

56.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Prescott made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| April 30, 2018 | 22,855 | $ 250.31 | $ 5,720,734 |
| April 30, 2018 | 17,610 | $ 251.73 | $ 4,432,902 |
| April 30, 2018 | 6,968 | $ 252.25 | $ 1,757,681 |
| April 30, 2018 | 5,600 | $ 253.74 | $ 1,420,920 |
| April 30, 2018 | 12,012 | $ 254.57 | $ 3,057,848 |
| April 30, 2018 | 10,241 | $ 255.22 | $ 2,613,684 |
| April 30, 2018 | 5,614 | $ 256.32 | $ 1,438,959 |
| April 30, 2018 | 1,100 | $ 257.33 | $    283,058 |

Thus, in total, before the fraud was exposed, he sold 82,000 Company shares on inside information, for which he received over $20.7 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

57.    The Company's 2018 Proxy Statement stated the following about Defendant Prescott:

Mr. Prescott served as our President and Chief Executive Officer from 2002 until his retirement in June 2015. Prior to joining Align, Mr. Prescott was President and Chief Executive Officer of Cardiac Pathways, Inc. from May 1999 to August 2001 and a consultant for Boston Scientific Corporation from August 2001 to January 2002 after its acquisition of Cardiac Pathways in August 2001. Prior to Cardiac Pathways, Mr. Prescott held various sales, general management and executive roles at Nellcor Puritan Bennett, Inc. from April 1994 to May 1999, and various management positions at GE Medical Systems from October 1987 to April 1994. In addition, Mr. Prescott served in sales, marketing and management roles at Siemens AG from December 1980 to July 1986. He received his B.S. in Civil Engineering from Arizona State University and Masters in Management from Northwestern University. Mr. Prescott has served as a member of the Board since joining Align in 2002.

58.    Upon information and belief, Defendant Prescott is a citizen of the State of California.

**Defendant Saia**

59.     Defendant Andrea L. Saia ("Saia") has served as a Company director since 2013, and serves on the Audit Committee and the Compensation Committee. According to the 2018 Proxy Statement, as of March 21, 2018, Defendant Saia beneficially owned 21,248 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 21, 2018 was $270.14, Saia owned over $5.7 million worth of Align stock.

60.     For the fiscal year ended December 31, 2017, Defendant Saia received $505,889 in compensation from the Company, comprised of $82,000 in fees earned or paid in cash and $423,889 in stock awards.

61.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Saia made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| May 24, 2018 | 4,067 | $ 311.89 | $ 1,268,436 |

Thus, in total, before the fraud was exposed, she sold 4,067 Company shares on inside information, for which she received approximately $1.3 million. Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

62.     The Company's 2018 Proxy Statement stated the following about Defendant Saia:

Ms. Saia has served as a director of Align since July 2013. Ms. Saia was previously the Global Head of Vision Care in the Alcon division of Novartis AG, from 2011 until her retirement in 2012. Prior to this role, she served as President and Chief Executive Officer of CibaVision Corporation, a subsidiary of Novartis, from 2008 to 2011. From 2005 to 2007, she relocated to Switzerland and served as President of Europe, Middle East, and Africa operations, CibaVision's largest regional business unit. She initially joined CibaVision in 2002 as Global Head of Marketing and was promoted to President of the Global Lens Business the following year. Prior to Novartis, Ms. Saia was the Chief Marketing Officer for GCG Partners Inc. Ms. Saia also held senior management and marketing positions with global consumer products companies such as Procter & Gamble

Co., Unilever, and Revlon, Inc. Ms. Saia earned an M.B.A. from J.L. Kellogg Graduate School of Management and a B.S. in Business Administration from Miami University. Ms. Saia also served on the board of directors of Coca-Cola Enterprises, Inc., the marketer, producer and distributor of Coca-Cola products in European markets from 2012 to 2016. Since July 2016, Ms. Saia has also served on the board of directors of LivaNova PLC, a global medical technology company.

**Defendant Santora**

63. Defendant Greg J. Santora ("Santora") has served as a Company director since 2003, and is the Chair of the Audit Committee and a member of the Compensation Committee. According to the 2018 Proxy Statement, as of March 21, 2018, Defendant Santora beneficially owned 22,115 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 21, 2018 was $270.14, Santora owned approximately $6 million worth of Align stock.

64. For the fiscal year ended December 31, 2017, Defendant Santora received $514,389 in compensation from the Company, comprised of $90,500 in fees earned or paid in cash and $423,889 in stock awards.

65. During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Santora made the following sale of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| May 29, 2018 | 5,500 | $ 324.07 | $ 1,782,385 |

Thus, in total, before the fraud was exposed, he sold 5,500 shares of Company stock on inside information, for which he received approximately $1.8 million. His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

66. The Company's 2018 Proxy Statement stated the following about Defendant Santora:

Mr. Santora has served as a director of Align since July 2003. Mr. Santora served as Chief Financial Officer at Shopping.com, a provider of internet-based comparison shopping resources, from December 2003 until September 2005. From 1997 through 2002, he served as Senior Vice President and Chief Financial Officer for Intuit, Inc., a provider of small

business and personal finance software. Prior to Intuit, Mr. Santora spent nearly 13 years at Apple Computer in various senior financial positions including Senior Finance Director of Apple Americas and Senior Director of Internal Consulting and Audit. Mr. Santora, who began his accounting career with Arthur Andersen L.L.P., has been a CPA since 1974. He served on the board of directors of RetailMeNot, Inc., a digital coupon site, from May 2013 until its sale in May 2017. Mr. Santora holds a B.S. in Accounting from the University of Illinois and an M.B.A. from San Jose University.

67.     Upon information and belief, Defendant Santora is a citizen of the State of California.

**Defendant Siegel**

68.     Defendant Susan E. Siegel ("Siegel") has served as a Company director since 2017. According to the 2018 Proxy Statement, as of March 21, 2018, Defendant Siegel beneficially owned 3,929 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 21, 2018 was $270.14, Santora owned approximately $1.1 million worth of Align stock.

69.     For the fiscal year ended December 31, 2017, Defendant Siegel received $561,891 in compensation from the Company, comprised of $45,833 in fees earned or paid in cash, and $516,058 in stock awards.

70.     The Company's 2018 Proxy Statement stated the following about Defendant Siegel:

Susan E. Siegel has been a member of our Board of Directors since 2017. In November 2017, she was appointed Chief Innovation Officer at General Electric and Chief Executive Officer of GE Business Innovations, GE's growth and innovation business. Since 2012, she has been Chief Executive Officer of GE Ventures, now subsumed into her new role. Prior to joining GE, from May 2006 to May 2012, she was a General Partner at Mohr Davidow Ventures, where she led healthcare and lifescience investments. From April 1998 to April 2006, Ms. Siegel was at Affymetrix, Inc. where she served as President and as a member of the board of directors. Ms. Siegel holds a B.S. in Biology from the University of Puerto Rico and a M.S. in Biochemistry and Molecular Biology from Boston University Medical School.

71.     Upon information and belief, Defendant Siegel is a citizen of the State of California.

**Defendant Thaler**

72.     Defendant Warren S. Thaler ("Thaler") has served as a Company director since 2004, and is a member of the Audit Committee. According to the 2018 Proxy Statement, as of March 21, 2018,

Defendant Thaler beneficially owned 139,099 shares of the Company's common stock.[4] Given that the price per share of the Company's common stock at the close of trading on March 21, 2018 was $270.14, Thaler owned approximately $37.6 million worth of Align stock.

73. For the fiscal year ended December 31, 2017, Defendant Thaler received $497,389 in compensation from the Company, comprised of $73,500 in fees earned or paid in cash, and $423,889 in stock awards.

74. During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Thaler made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| May 24, 2018 | 3,500 | $ 315.10 | $ 1,102,847 |
| August 23, 2018 | 3,500 | $ 363.62 | $ 1,272,669 |

Thus, in total, before the fraud was exposed, he sold 7,000 shares of Company stock on inside information, for which he received approximately $2.4 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

75. The Company's 2018 Proxy Statement stated the following about Defendant Thaler:

Mr. Thaler has served as a director of Align since June 2004. Since July 2017, Mr. Thaler has been a consultant to Gund Investment Corporation, an investment firm owned by Gordon Gund with holdings in real estate and private equity securities. Prior to acting as a consultant for Gund Investment Corporation, Mr. Thaler served as its president. Since 1990, Mr. Thaler has served on the board of directors of several privately held companies owned by the Gund family. From 1990 to 2005, Mr. Thaler was on the board of directors of the Cleveland Cavaliers and Gund Arena Company and from 2001 to 2005 represented the Cleveland Cavaliers as its Alternate Governor at meetings of the National Basketball Association's Board of Governors. Mr. Thaler received his B.A. from Princeton University and his M.B.A. from Harvard University.

---

[4] This figure includes 47,400 shares held by Defendant Thaler and 88,584 shares held by The Thaler Family Trust, for the benefit of family members, as to which Defendant Thaler disclaims beneficial ownership.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

76. By reason of their positions as officers, directors, and/or fiduciaries of Align and because of their ability to control the business and corporate affairs of Align, the Individual Defendants owed Align and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Align in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Align and its shareholders so as to benefit all shareholders equally.

77. Each director, officer, and controller of the Company owes to Align and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

78. The Individual Defendants, because of their positions of control and authority as directors, officers, and/or controllers of Align, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

79. To discharge their duties, the officers, directors, and controllers of Align were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

80. Each Individual Defendant, by virtue of his or her position as a director, officer, and/or controlling shareholder owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors, officers, and controllers of Align, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the

Individual Defendants who were also officers, directors, and/or controllers of the Company has been ratified by the remaining Individual Defendants who collectively comprised Align's Board at all relevant times.

81.     As senior executive officers, directors, and controllers of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Additionally, the Individual Defendants had a duty not to cause the Company to waste corporate assets by making the Company repurchase its own stock at artificially inflated prices, to the detriment of the Company and its shareholders.

82.     To discharge their duties, the officers and directors of Align were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Align were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Align's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Align conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Align and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Align's operations would comply with all applicable laws and Align's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

83.     Each of the Individual Defendants further owed to Align and the shareholders the duty of loyalty requiring that each favor Align's interest and that of its shareholders over their own while

conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

84.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Align and were at all times acting within the course and scope of such agency.

85.     Because of their advisory, executive, managerial, directorial, and controlling positions with Align, each of the Individual Defendants had access to adverse, non-public information about the Company.

86.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Align.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

87.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

88.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 10(b) and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price while the Company repurchased its own stock.

89.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts,

fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Align was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

90.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

91.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Align, and was at all times acting within the course and scope of such agency.

## ALIGN'S CODE OF CONDUCT

92.     The Company's Code of Business Conduct and Ethics (the "Code of Conduct" or "Code") states that it "applies to all directors, officers, employees, temporary workers, consultants and contractors of Align and its subsidiaries, who, unless otherwise specified, are referred to [herein] as our 'employees.'"

93.     The Code of Conduct further states that "[a]ll of our employees are expected to read and understand this Code and perform their Align duties in line with the standards of ethics and business practices embodied within this Code."

94.     The Code of Conduct provides, regarding reporting violations thereof, that:

As part of our commitment to honest and ethical behavior, we require all employees to report any actual or apparent violations of law or ethical standards so that they can be investigated and dealt with appropriately. . . . This obligation extends to any instance where you may suspect, but are uncertain whether, a violation may be occurring. We impose this

requirement even on individuals who are not directly violating ethical and legal standards because anytime anyone fails to live up to our ethical and legal obligations, Align can be profoundly and adversely affected. No one can condone such activities and, therefore, anyone aware of even a potential violation owes a duty to Align and himself/herself to disclose it.

95.     Regarding public communications and filings, the Code of Conduct provides that:

Align files reports and other documents with regulatory authorities, including the United States Securities and Exchange Commission and the Nasdaq Global Market. From time to time we also make other public communications, such as issuing press releases. If you are involved in the preparation of public reports and communications *you must use all reasonable efforts to comply with our disclosure controls and procedures, which are designed to ensure full, fair, accurate, timely and understandable disclosure* in our public reports and communications.

*If you believe that any disclosure is materially misleading or if you become aware of any material information that you believe should be disclosed to the public, it is your responsibility to bring this information to the attention of the Legal Department*. If you believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should notify the Audit Committee of the Board of Directors by filing a report through EthicsPoint or by using our toll-free hotline and indicating that the report concerns questionable accounting or auditing conduct or practices.

(Emphasis added.)

96.     Regarding compliance with laws, the Code of Conduct provides, in relevant part:

*All employees, agents and contractors must comply with all applicable laws, regulations, rules and regulatory orders*. . . . Each employee, agent and contractor must acquire appropriate knowledge of the requirements relating to his or her duties sufficient to enable him or her to recognize potential dangers and to know when to seek advice from the Legal Department on specific policies and procedures. Violations of laws, regulations, rules and orders may subject the employee, agent or contractor to individual criminal or civil liability, as well as to discipline by Align. Such individual violations may also subject Align to civil or criminal liability or the loss of business.

(Emphasis added.)

97.     Regarding insider trading, the Code of Conduct provides the following:

Obligations under the U.S. securities laws apply to everyone. In *the normal course of business, officers, directors, employees, agents, contractors and consultants of Align may come into possession of significant, sensitive information*. This information is the property of Align—you have been entrusted with it*. You may not profit from it by buying or selling securities yourself,* or passing on the information to others to enable them to profit or for them to profit on your behalf. Insider trading is a crime, penalized by fines of up to $5,000,000 and 20 years in jail for individuals. In addition, the SEC may seek the

imposition of a civil penalty of up to three times the profits made or losses avoided from the trading. Insider traders must also disgorge any profits made, and are often subjected to an injunction against future violations. Finally, insider traders may be subjected to civil liability in private lawsuits. Employers and other controlling persons (including supervisory personnel) are also at risk under U.S. securities laws. Controlling persons may, among other things, face penalties of the greater of $5,000,000 or three times the profits made or losses avoided by the trader if they recklessly fail to take preventive steps to control insider trading. Thus, it is important both to you and Align that insider-trading violations not occur. You should be aware that stock market surveillance techniques are becoming increasingly sophisticated, and the chance that U.S. federal or other regulatory authorities will detect and prosecute even small-level trading is significant. Insider trading rules are strictly enforced, even in instances when the financial transactions seem small. You should contact the Chief Financial Officer or the Legal Department if you are unsure as to whether or not you are free to trade.

(Emphasis added.)

98.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 10(b) and 20(a) of the Exchange Act. Nine of the Individual Defendants violated the code by selling shares of Company stock during the Relevant Period while in possession of material, non-public information about the Company.

99.     Moreover, in violation of the Code of Conduct, the Individual Defendants failed to make full, fair, accurate, timely and understandable disclosure in public communications, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## ALIGN'S AUDIT COMMITTEE CHARTER

100.     The Company's has adopted a Charter for its Audit Committee. That charter provides that the responsibilities of the Audit Committee include, among other things:

- *Reviewing Financial Statements and Internal Controls.* Reviewing on a continuing basis the adequacy and effectiveness of the Company's system of internal controls and disclosure controls and procedures, including meeting periodically with the Company's

management and the independent auditors to review the adequacy and effectiveness of such controls and to review before release the disclosure regarding such system of controls required under SEC rules to be contained in the Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure.

101.    Regarding the Audit Committee's responsibilities with respect to quarterly filings, the Audit Committee Charter provides, in relevant part, that the Audit Committee will :

- *Earnings Release and Guidance. Reviewing before release the unaudited quarterly operating results in the Company's quarterly earnings release, with particular attention to financial information and earnings guidance provided to analysts.*

- *MD&A. Reviewing and discussing with management and the independent auditors the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the reports and certifications regarding internal controls over financial reporting and disclosure controls, prior to filing the Company's Quarterly Report on Form 10-Q with the SEC.*

## SEC DISCLOSURE REQUIREMENTS

102.    Item 1A of Form 10-Q requires registrants to provide information required by Item 503 of Regulation S-K, 17 C.F.R. §229.503, Risk Factors. Item 503 requires disclosure of the most significant matters that create risk in investing in a company's stock.

103.    In filing periodic financial statements with the SEC, Item 2 of Form 10-Q requires that registrants provide *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A"). Regulation S-K, 17 C.F.R. §229.303 requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

104.    As noted in the instructions to Item 303(a), registrants must disclose and "focus specifically" on material events and uncertainties that would cause the historical financial information about the Company not to be necessarily indicative of future operating results. This includes "matters that would have an impact on future operations and [matters that] have not had an impact in the past." The instructions state, in relevant part:

The discussion and analysis shall **focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results** or of future financial condition. **This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past**, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

(Emphasis added.)

105.     The SEC issued an interpretive release to Item 303 of Regulation S-K on May 18, 1989 (the "1989 Interpretive Release"). The 1989 Interpretive Release clarifies that there is a duty to disclose where a demand, trend, commitment, uncertainty or event is both presently known to management and reasonably likely to have a material effect on either the registrant's financial condition or results of operations. The 1989 Interpretive release states, in relevant part:

> **A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation**.
>
> * * *
>
> **Events that have already occurred or are anticipated often give rise to known uncertainties**. For example, a registrant may know that a material government contract is about to expire. The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed. More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed. The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant. **In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required**.[5]

(Emphasis added.)

------

[5] *Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures*, Release Nos. 33-6835 and 34-26831, 1989 SEC LEXIS 1011, at *13, *18 (May 18, 1989) (footnote omitted).

106.    On December 19, 2003, the SEC issued an interpretive release to Item 303 of Regulation S-K, with an effective date of December 29, 2003 (the "2003 Interpretive Release"). The 2003 Interpretive Release established that the Registration Statement was required to disclose known demands, events, or uncertainties, except for those that management determined: (1) were not reasonably likely to occur; or (2) would not have a material effect on the Company's operating results. The 2003 Interpretive Release states, in pertinent part:

> As we have explained in prior guidance, *disclosure of a trend, demand, commitment, event or uncertainty is required unless a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition*, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.[6]

(Emphasis added.)

107.    Item 9A of Form 10-Q requires registrants to provide information required by Item 307 of Regulation S-K, 17 C.F.R. §229.307, *Disclosure Controls and Procedures*. Item 307 required that the Company's CEO and CFO's conclusions about the effectiveness of Align's disclosure controls be reported. Under 17 C.F.R. §240.13a-15(e):

> the term disclosure controls and procedures means *controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits* under the Act (15 U.S.C. 78a et seq.) *is recorded, processed, summarized and reported,* within the time periods specified in the Commission's rules and forms. *Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.*

(Emphasis added.)

---

[6] *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, Release Nos. 33-8350 and 34-48960, 2003 SEC LEXIS 3034, at *36 (Dec. 19, 2003) (footnote omitted).

# INDIVIDUAL DEFENDANTS' MISCONDUCT

## Background

108. Align is a medical device company known best for its clear dental aligners marketed under the brand name Invisalign®. It also markets iTero® intraoral scanners for orthodontics and dentistry.

109. The Company operates in two segments, Clear Aligner and Scanner. Clear Aligner is responsible for the majority of Align's revenues, accounting for 89% of total revenues in fiscal year 2017.

110. The Company sells its products to dentists, orthodontists and other professionals, as well as resellers. Align does not sell its clear aligners directly to end consumers.

111. The Company has an Advantage Program for its doctor customers, which provides discounts based on purchase volumes. The details of this program are opaque, if not unavailable, to the public.

## False and Misleading Statements

### April 25, 2018 Press Release and Conference Call

112. On April 25, 2018 the Company issued a press release announcing its financial results for the fiscal quarter ended March 31, 2018. The press release, which was also attached to a Form 8-K filed with the SEC on the same date, stated, in relevant part:

- Q1 revenues up 40.8% year-over-year to a record $436.9 million, and diluted EPS of $1.17

- Q1 operating income up 59.2% year-over-year to $98.2 million or operating margin of 22.5%

- Q1 total Invisalign case shipments up 30.8% year-over-year to 272.2 thousand

- Q1 Invisalign cases for teenage patients up 40.9% year-over-year to 69.1 thousand

- Q1 scanner and services revenues up 84.0% year-over-year to $51.4 million

SAN JOSE, Calif., April 25, 2018 -- Align Technology, Inc. (Nasdaq: ALGN) today reported financial results for the first quarter ended March 31, 2018. Invisalign case shipments in the first quarter of 2018 (Q1'18) were 272.2 thousand, up 30.8% year-over-

year. Americas and International region case shipments were up year-over-year 24.0% and 43.4%, respectively. Beginning Q1'18, Americas region includes North America and LATAM and the International region includes EMEA and APAC. Q1'18 Invisalign cases for teenage patients were 69.1 thousand, up 40.9% year-over-year. Q1'18 revenues were $436.9 million, up 40.8% year-over-year with Q1'18 operating income $98.2 million, up 59.2% year-over-year resulting in an operating margin of 22.5%. Net profit was $95.9 million, or $1.17 per diluted share, up $0.32 over the prior year.

Commenting on Align's Q1 2018 results, Align Technology President and CEO Joe Hogan said, "I'm pleased to report better than expected first quarter results and a strong start to the year for Align, with revenues, volumes and EPS above our guidance. Record Q1 revenues were up 41% year-over-year reflecting continued strong Invisalign volume across all geographies and customer channels, as well as iTero scanner sales which were up 84% year-over-year. Q1 Invisalign volume growth of 31% year-over-year was driven by increased utilization including strong teen case growth globally, and expansion of our customer base, which included over 4,200 new Invisalign-trained doctors worldwide."

113.    Also on April 25, 2018, the Individual Defendants caused the Company to hold an earnings call with analysts and investors to discuss its financial results for the quarter ended March 31, 2018. During that call, Defendant Morici stated, in relevant part:

Now, for our Q1 financial results. ***Total company revenue for the first quarter was a record $436.9 million, up 3.7% from the prior quarter and up 40.8% from the corresponding quarter a year ago***. Year-over-year revenue growth includes a five-point benefit from favorable foreign exchange. ***Clear aligner revenue*** of $385.5 million ***was up*** 5.8% sequentially ***on higher than expected volume***.

Year-over-year clear aligner revenue growth of 36.5% reflected strong Invisalign shipment growth across all customer channels and geographies and ***increased Invisalign ASPs. Q1 Invisalign ASPs were up sequentially approximately $5 from Q4 to $1,310***, reflecting favorable foreign exchange and product mix, partially offset by sales promotions and revenue deferrals. ***On a year-over-year basis, Q1 Invisalign ASPs were up approximately $40***, reflecting favorable foreign exchange, price increases and product mix partially offset by sales promotions and deferrals related to additional aligners.

For the first quarter, total Invisalign shipments of 272,200 cases were up 6.7% sequentially and up 30.8% year-over-year, driven by growth across all regions. For Americas' Orthodontists, Q1 Invisalign case volume was up 8.5% sequentially and up 27% year-over-year. For Americas' GP Dentists, Invisalign case volume was up 5.1% sequentially and up 19.6% year-over-year. For international doctors, Invisalign case volume was up 6.2% sequentially and up 43.4% year-over-year.

* * *

Clear aligner gross margin for the first quarter was 77%, down 0.6 points sequentially primarily due to increased aligners per case and higher training costs, ***partially offset by higher Invisalign ASPs***. Clear aligner gross margin was down 0.9 points year-over-year, primarily due to regional expansion of our manufacturing activities ***partially offset by higher worldwide ASPs***.

(Emphasis added.)

*2018 Q1 10-Q*

114.    On May 3, 2018, the Company filed with the SEC its report for the fiscal quarter ended March 31, 2018 on Form 10-Q (the "2018 Q1 10-Q"), which was signed by Defendants Hogan and Morici.

115.    Regarding "Risk Factors," the 2018 Q1 10-Q mischaracterized then-existing risks related to declines in the Company's ASP as potential, stating, in relevant part:

> ***We may experience declines in average selling prices of our products which may decrease our net revenues.***
>
> We provide volume-based discount programs to our doctors. In addition, we sell a number of products at different list prices. **<u>If</u> we change the volume-based discount programs affecting our average selling prices; <u>if</u> we introduce any price reductions or consumer rebate programs; <u>if</u> we expand our discount programs in the future or participation in these programs increases**; or if our product mix shifts to lower priced products or to products that have a higher percentage of deferred revenue, **our average selling prices would be adversely affected and our net revenues, gross profit, gross margin and net income may be reduced.**

(Bold & italic subheading in original. Emphasis added in bold and underline.)

116.    Regarding the Company's internal controls, the 2018 Q1 10-Q stated, in relevant part:

> Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we have evaluated the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q. Based upon that evaluation, *our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures are effective as of March 31, 2018,* to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and our Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure, and that such information is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms.

(Emphasis added.)

117.    Attached to the 2018 Q1 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Hogan and Morici, attesting to the accuracy of the 2018 Q1 10-Q.

*July 25, 2018 Press Release and Conference Call*

118.     On July 25, 2018, the Company issued a press release announcing its financial results for the fiscal quarter ended June 30, 2018. The press release, which was also attached to a Form 8-K filed with the SEC on the same date, stated, in relevant part:

- Q2 revenues up 37.5% year-over-year to a record $490.3 million, and diluted EPS of $1.30

- Q2 operating income up 46.8% year-over-year to $122.7 million, operating margin of 25.0%

- Q2 total Invisalign case shipments up 30.5% year-over-year to 302.7 thousand

- Q2 Invisalign cases for teenage patients up 42.1% year-over-year to 78.4 thousand

- Q2 iTero scanner and services revenues up 60.9% year-over-year to $57.0 million

SAN JOSE, Calif., July 25, 2018 -- Align Technology, Inc. (Nasdaq: ALGN) today reported financial results for the second quarter ended June 30, 2018. Invisalign case shipments in the second quarter of 2018 (Q2'18) were 302.7 thousand, up 30.5% year-over-year. Americas and International region case shipments were up year-over-year 22.2% and 45.4%, respectively. Q2'18 Invisalign cases for teenage patients were 78.4 thousand, up 42.1% year-over-year. Q2'18 revenues were $490.3 million, up 37.5% year-over-year and Q2'18 operating income was $122.7 million, up 46.8% year-over-year resulting in an operating margin of 25.0%. Net profit was $106.1 million, or $1.30 per diluted share, up $0.45 per share year-over-year.

Commenting on Align's Q2 2018 results, Align Technology President and CEO Joe Hogan said, "I'm pleased to report another better than expected quarter for Align. Our second quarter results reflect strong growth across our customer channels with record volume in all regions and in almost every country market. Year-over-year revenue growth of 37.5% was driven by continued momentum from Invisalign doctors and increased adoption of Invisalign treatment for teenage patients which grew 42.1%. Q2 Invisalign volume growth of 30.5% year-over-year reflects increased utilization and expansion of our customer base, which was over 50,000 for the first time and included more than 5,000 new Invisalign-trained doctors. We also saw momentum from the iTero scanner and services business which includes the continued rollout of iTero scanners across Heartland Dental's installed base, as well as the first iTero scanner shipments to China."

119.     Also on July 25, 2018, the Individual Defendants caused the Company to hold an earnings call with analysts and investors to discuss its financial results for the quarter ended June 30, 2018. During that call, Defendant Morici stated, in relevant part:

Year-over-year Clear Aligner revenue growth of 35% reflected strong Invisalign shipment growth across all customer channels and geographies and *increased Invisalign ASPs*. Q2 Invisalign *ASPs were up sequentially approximately $5 from Q1 to $1,315*, reflecting increased secondary revenue and favorable price mix, partially offset by unfavorable FX

and sales promotions. ***On a year-over-year basis, Q2 Invisalign ASPs were up approximately $30 reflecting favorable FX***, price increases and product mix, ***partially offset by sales promotions and deferrals related to additional liners***.

For the second quarter, total Invisalign shipments of 302.7 thousand cases were up 11.2% sequentially, and up 30.5% year-over-year, driven by growth across all regions. ***For Americas orthodontists, Q2 Invisalign case volume was up 9% sequentially and up 25% year-over-year***. For Americas GP dentists, Invisalign case volume was up 8.6% sequentially and up 18.2% year-over-year. For international doctors, Invisalign case volume was up 14.9% sequentially and up 45.4% year-over-year. For international doctors, Invisalign case volume was up 14.9% sequentially and up 45.4% year-over-year.

\* \* \*

Moving onto gross margin, second quarter overall gross margin was 74.6%, down 0.3 points sequentially and down 1.4 points year-over-year. Clear Aligner gross margin for the second quarter was 76.5%, down 0.5 points sequentially, primarily due to costs from the regional expansion of our manufacturing operation and increased aligners per case. Clear Aligner gross margin was down 1.6 points year-over-year, primarily due to regional expansion of our manufacturing activities and increased aligners per case, ***partially offset by higher worldwide ASPs***.

(Emphasis added.)

120. With respect to the Company's projections for Q3 2018, Defendant Morici stated, in relevant part:

Invisalign case volume is expected to be in the range of 302,000 to 307,000 cases, up approximately 28% to 30% over the same period a year ago. We expect Q3 revenues to be in the range of $493 million to $503 million, an increase of approximately 28% to 31% year-over-year. ***We expect Q3 gross margin to be in the range of 74% to 74.4%, reflecting higher expenses*** as we regionalize our treatment planning and manufacturing operations, ***partially offset by higher ASPs***.

(Emphasis added.)

121. Later, in response to an analyst's questions about the Company's margins in Q3 2018, Defendant Morici failed to reveal a new, untested promotion that would be launched in Q3 2018, which could (and ultimately did) lower ASPs in Q3 2018, affecting margins. During the exchange, the following relevant statements were made:

[Robert Jones -- Goldman Sachs – Analyst]

On the 3Q EBIT margins, looks a little maybe softer than expected following a relatively strong 2Q on the EBIT margin line. And so just was wondering if you could talk about some of the moving pieces. I think you talked about some of the spending – areas of spend in your prepared remarks. So maybe just what informs that 3Q EBIT guide?

[Defendant Morici]

I mean I think when we look at – as was noted earlier, we are investing globally to try to – as we regionalize some of our manufacturing and treatment clients, so there's some costs associated with that. We saw that in the second quarter. Some of that will continue into the third quarter. But we'll also see from an investment standpoint, from an operating expenditure standpoint, it's balanced. The high end of our guide is 24.9%, which is pretty consistent to what we saw in Q2.

***2018 Q2 10-Q***

122. On July 24, 2018 the Company filed with the SEC its report for the fiscal quarter ended June 30, 2018 on Form 10-Q (the "2018 Q2 10-Q"), which was signed by Defendants Hogan and Morici.

123. Regarding "Risk Factors," the 2018 Q2 10-Q mischaracterized then-existing risks related to declines in the Company's ASP as potential risks, stating, in relevant part::

> ***We may experience declines in average selling prices of our products which may decrease our net revenues.***
>
> We provide volume-based discount programs to our doctors. In addition, we sell a number of products at different list prices. **If we change the volume-based discount programs affecting our average selling prices; if we introduce any price reductions or consumer rebate programs; if we expand our discount programs in the future or participation in these programs increases;** or if our product mix shifts to lower priced products or to products that have a higher percentage of deferred revenue, **our average selling prices would be adversely affected and our net revenues, gross profit, gross margin and net income may be reduced**.
>
> Our operations and financial results are subject to various risks and uncertainties, including those described in Part I, Item 1A, "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2017, which could adversely affect our business, financial condition, results of operations, cash flows, and the trading price of our common and capital stock. There have been no material changes to our risk factors since our Annual Report on Form 10-K for the year ended December 31, 2017.

(Bold & italic subheading in original. Emphasis added in bold and underline.)

124. Regarding the Company's internal controls and procedures, the 2018 Q2 10-Q stated, in relevant part:

> Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we have evaluated the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q. ***Based upon that evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures are effective as of June 30, 2018***, to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our Chief

Executive Officer and our Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure, and that such information is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms.

(Emphasis added.)

125. Attached to the 2018 Q2 10-Q were SOX certifications signed by Defendants Hogan and Morici, attesting to the accuracy of the 2018 Q2 10-Q.

126. The statements in ¶¶ 112-125 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) the Company changed its customer loyalty Advantage Program in North America at the beginning of fiscal year 2018, resulting in higher discounts for doctors; (2) the Company initiated a new promotion in Q3 2018 related to Invisalign, which was distinct from previous promotions, and therefore untested; (3) as a result of the foregoing, the Company's ASP would decline, diminishing net income and profit margins; (4) the Company failed to maintain internal controls; and (5) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

**The Truth Begins to Emerge**

127. On October 24, 2018 the Company issued a press release announcing its financial results report for the fiscal quarter ended September 30, 2018. The press release, which was also filed with the SEC on the same date attached to a Form 8-K, stated, in relevant part:

- Q3 revenues up 31.2% year-over-year to a record $505.3 million, and diluted EPS of $1.24

- Q3 operating income up 26.8% year-over-year to $125.2 million, operating margin of 24.8%

- Q3 total Invisalign case shipments up 35.3% year-over-year to 319.3 thousand

- Q3 Invisalign cases for teenage patients up 41.1% year-over-year to 98.5 thousand

- Q3 iTero scanner and services revenues up 79.1% year-over-year to $78.2 million

SAN JOSE, Calif., October 24, 2018 -- Align Technology, Inc. (Nasdaq: ALGN) today reported financial results for the third quarter ended September 30, 2018. Invisalign case shipments in the third quarter of 2018 (Q3'18) were 319.3 thousand, up 35.3% year-over-year. Americas and International region case shipments were up year-over-year 29.1% and 45.6%, respectively. Q3'18 Invisalign cases for teenage patients were 98.5 thousand, up 41.1% year-over-year. Q3'18 revenues were $505.3 million, up 31.2% year-over-year and Q3'18 operating income was $125.2 million, up 26.8% year-over-year resulting in an operating margin of 24.8%. Net profit was $100.9 million, or $1.24 per diluted share, up $0.23 year-over-year.

Commenting on Align's Q3 2018 results, Align Technology President and CEO Joe Hogan said, "I'm pleased to report third quarter results with revenue and earnings above our outlook driven by higher than expected Invisalign volume -- offset somewhat by lower ASPs and foreign exchange. We also had another record quarter for the iTero scanner business with revenues up 79.1% year-over-year. Q3 Invisalign volume increased 5.5% sequentially and up 35.3% year-over-year reflecting strength across regions and customer channels, as well as strong growth from both teen and adult patients. From a product perspective, we saw strength across the Invisalign portfolio with growth from both comprehensive and non-comprehensive products, reflecting an acceleration in the non-comprehensive category related to expansion of our product portfolio, as well as new sales programs and promotions intended to increase adoption and utilization. We also saw continued strength from international regions, especially Asia Pacific, which was our 2nd largest region after the Americas in Q3."

128. After markets closed on October 24, 2018, the Company held an earnings call with analysts and investors to discuss the Company's financial results for the quarter ended September 30, 2018. During that call, Defendants Hogan and Morici revealed, for the first time, that certain moves by the Company that diminished ASP, and which had been implemented before the beginning of the Relevant Period.

129. Regarding ASPs, Defendant Hogan stated, in relevant part, that: "[i]n Q3, Invisalign ASPs were down sequentially due to a combination of promotional programs, unfavorable foreign exchange and product mix shift, partially offset by price increases across all regions."

130. Defendant Morici provided further details on the Company's Q3 2018 results, stating, in relevant part:

Total revenue for the third quarter was $505.3 million, up 3.1% from the prior quarter and up 31.2% from the corresponding quarter a year ago. Year-over-year revenue growth was favorable in all regions. ***Clear Aligner revenue of $421.1 million was down 1.4% sequentially, driven by lower ASPs as a result of higher-than-expected discounts*** and unfavorable foreign exchange, partially offset by increased volume.

Year-over-year, Clear Aligner revenue growth of 25% reflected strong Invisalign shipment growth across all customer channels and geographies and was ***partially offset by lower ASPs***. As [Defendant Hogan] mentioned earlier in his remarks, ***Q3 Invisalign ASPs were down sequentially and year-over-year due to a combination of promotional programs***, unfavorable foreign exchange and product mix, partially offset by price increases across all regions.

(Emphasis added.)

131.    Defendant Morici continued, providing the following color on the promotions that drove decreases in ASP:

> ***In Q3, we offered a new product promotions*** [sic] designed to increase adoption of Invisalign treatment ***and we saw much higher than expected uptake on some of these promotions***. In addition, ***at the beginning of the year, we created a more robust North America Advantage customer loyalty program***, which has been very favorably received by our doctors.
>
> ***The new advantage program changed to a semi-annual discount qualification period instead of a quarterly one with additional tiers that provide doctors with more incentive to move up the tiers by increasing their Invisalign case volume. As a result, more doctors are moving up in tiers and achieving higher overall discount than they were under the prior program***.
>
> In Q3, we also saw a shift toward lower ASP noncomprehensive products, some of which is tied to promotions and some is tied to continued progress expanding our business with GP dentists and DSOs. Specifically, ***Q3 ASPs were down by approximately $85*** and includes $24 of unfavorable foreign exchange and down $80 year-over-year and includes $15 of unfavorable foreign exchange.

(Emphasis added.) As the changes to the Advantage Program included a semi-annual discount qualification, the Individual Defendants knew, or recklessly disregarded, that the impacts from changes to the Advantage Program would be felt in the second half of fiscal 2018. Further, the changes to the Advantage Program made at the outset of 2018 created a known uncertainty that should have been disclosed, and rendered the Company's statements regarding the impact of potential changes in promotions false and misleading.

132.    Defendant Morici provided guidance for the quarter ended December 31, 2018, which included negative impacts from lower ASPs. Defendant Morici stated, in relevant part:

> We expect Q4 revenues to be in the range of $505 million to $515 million, an increase of approximately 20% to 22% year-over-year, reflecting strong growth for Invisalign volumes, ***offset by lower ASPs, due primarily to ongoing promotional discounts, the effect of our new Advantage Customer Loyalty program***, continued mix shift toward non-comprehensive products as well as foreign exchange.

(Emphasis added.)

133.    Analysts questions following Defendants Hogan's and Morici's presentations centered largely around the newly-disclosed promotions and their impact on ASP. Regarding the decline in ASP, Defendants Morici and Hogan engaged in the following dialogue with an analyst from Goldman Sachs:

> [Robert Jones -- Goldman Sachs – Analyst]
>
> I guess just to start on the lower ASPs, would you guys provide some details around, at least the areas that impacted it. And John, if I heard you correctly, *it sounds like, of the $85 sequential decline, if I remove FX, it would have been more like $60, $61 sequential decline.* So, of that decline, I was hoping maybe you could just break down how much of that came from promotions versus mix shift. And then I guess the follow-up would be, I don't necessarily remember you guys talking so much about the additional promotional programs. So curious if there was something in the marketplace that kind of force you to react to put the promotions in place or if this was something that was always planned and maybe the uptake was just greater than you thought.
>
> [Defendant Morici]
>
> Yeah. Hey, Bob. This is John. On the remaining piece that's left, about half of the drop in ASPs was due to mix, is mix shift to the lower-stage products and about the other half or *$30 or so was related to those promotions*.
>
> [Defendant Hogan]
>
> And hey, Bob, it's Joe, look, on the -- obviously *on the Advantage Program* in the special programs we ran for the quarter. We do this all the time. We are trying to encourage customer stickiness, we're checking out different segments of the marketplace. We do this all the time. But in this case, what happened is we incentivize the upper end of our customer segment. *We did not get the engagement in the lower end that we anticipated. And so in that sense, you know we'll shut that thing down. We won't repeat it again.* We obviously learned from it and we move on.

(Emphasis added.) The $30 sequential decline in ASP attributed to the promotions more than wiped out the $10 combined sequential increase in ASP achieved in the quarters ended March 31 and June 30, 2018.

134.    In response to an analyst's question about the decline in ASP, Defendant Hogan admitted that promotional programs are not disclosed, stating, in relevant part:

> we're just trying some things in the sense of incentivizing the marketplace and it just happened to engage the upper tier of our Advantage Program rather than the lower tier that we had hoped and *these go on all the time kind of under the radar screen.* [] *and we don't talk about them. This one in the sense of how performed obviously affecting ASP, we just have to give you clarity on it.*

(Emphasis added.)

135.    Later, in response to another analyst's question, Defendant Morici admitted that the Company was not sure of how the market would react to its promotions, which were distinct from those run in the past. Defendant Morici stated, in relevant part:

> We do these things to figure out what really works in the marketplace. And there is -- look, I've never been in a business that has price elasticity curves like this business and you really have to study those.
>
> We launch promotions, we do with certain prices, we see what the uptakes are and we learn from those things. ***We're just launching this against a different type of advantage structured program and these tiers are different and this takeup was completely different than what we've seen before***.

(Emphasis added.) Thus, Defendant Morici admitted that the promotion was a known uncertainty, that should have been disclosed to the market.

136.    Defendant Morici, in response to yet another analyst question regarding ASP, admitted that the decline was likely to continue into the following quarter, stating, in relevant part: "I think what we are expecting is kind of the Q4 ASPs that we're kind of calling should be that low point and that's how you should think about things going forward."

137.    Also on October 24, 2018, the Company filed a Form 8-K announcing that Defendant Pascaud "ha[d] decided to reduce his responsibilities and transition to a part-time position to spend more time with his family."

138.    On this news, the price of the Company's common stock fell from a closing price of $290.83 per share on October 24, 2018 to close at $232.07 per share on October 25, 2018—a drop of $58.76, or over 20%. The price per share continued to drop over the following two trading days, closing at $217.94 on October 29, 2018, representing a 25% decline from their closing price on October 24, 2018.

139.    On November 1, 2018, the Company issued a press release announcing that its Senior Vice President and Managing Director of the Americas region since December 2017, Christopher C. Puco ("Puco") "ha[d] decided to leave the Company to pursue other interests." The press release elaborated that

Verified Shareholder Derivative Complaint

Puco's responsibilities would be transitioned to Defendant Hogan beginning on the day the press release was issued, and the Company had "launched an executive search for Mr. Puco's replacement."

## REPURCHASES DURING THE RELEVANT PERIOD

140.    During the period in which the Company made false and misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company. Indeed, as the Company announced on May 23, 2018, a new stock repurchase program, for the purchase of $600 million of stock over three years, was authorized during the Relevant Period, before the truth emerged. In total, the Company spent an aggregate amount of approximately $150 million to repurchase 425,891 shares of its own common stock from July 1, 2018 through August 31, 2018—during the very quarter in which the Company launched the promotion that had a strongly negative impact on ASP, without disclosing the promotion.

141.    As the Company stock was actually only worth $217.94 per share, the price at closing on October 29, 2018, the Company overpaid approximately $57.2 million in total for these repurchases.

142.    According to the Company's Form 10-Q for the quarter ended September 30, 2018, (the "2018 Q3 10-Q"), in the month of July 2018, the Individual Defendants caused the Company to repurchase 285,647 shares of its own common stock at an average price per share of approximately $350.08, for a total cost to the Company of approximately $100 million.

143.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $132.14 more than the actual worth of each share during the month of July 2018. Thus, the total over payment by the Company for repurchases of its own stock during the month of July 2018 was over $37.7 million.

144.    According to the Company's 2018 Q3 10-Q, in the month of August 2018, the Individual Defendants caused the Company to repurchase 140,244 shares of its own common stock at an average price per share of approximately $356.54, for a total cost to the Company of approximately $50 million.

145.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $138.60 more than the actual worth of each share during the quarter ended September 30, 2018. Thus, the total over payment by the Company for repurchases of its own stock during month of August 2018 was over $19.4 million.

146.    In total, the Company overpaid an aggregate amount of approximately $57.2 million for repurchases of its own stock during the period of time in which the Company made false and misleading statements and omissions.

## EXCESSIVE COMPENSATION

147.    Align's directors, namely Defendants Hogan, Dallas, Lacob, Larkin, Morrow, Prescott, Saia, Santora, Siegel, and Thaler, breached their fiduciary duties by improperly awarding themselves excessive compensation, thereby wasting corporate assets.

148.    For the year ended December 31, 2017, the non-employee Individual Defendants serving on the Board each received over $478,000 in compensation from the Company ($544,034 on average), consisting of fees earned and stock awards. Defendant Larkin received in excess of $801,000 in compensation from Align for the year ended December 31, 2017.

149.    Such amounts are materially higher than the average total director compensation of $275,058[7] for a Fortune 100 company and the average of $288,909[8] for an S&P 500 company.

150.    Align, notably, is neither a Fortune 100 company nor a S&P 500 company.

151.    The current excessive level of compensation to non-employee members of the Board is and will continue to be harmful to both Align and its shareholders and wastes valuable and corporate assets.

## DAMAGES TO ALIGN

[7] *See* Meridian Compensation Partners, LLC's 2015 Trends in Outside Director Compensation, p. 4.
[8] *See* Spencer Stuart's U.S. Board Index 2017, p. 35.

152.    As a direct and proximate result of the Individual Defendants' conduct, Align has lost and will continue to lose and expend many millions of dollars.

153.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its CEO, its Senior Vice President, Global Finance and CFO, and its CMO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

154.    Such losses include, but are not limited to, approximately $57.2 million that the Company overpaid, at the direction of the Individual Defendants, for its repurchases of its own stock at artificially inflated prices.

155.    Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

156.    As a direct and proximate result of the Individual Defendants' conduct, Align has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment.

## DERIVATIVE ALLEGATIONS

157.    Plaintiff brings this action derivatively and for the benefit of Align to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Align, unjust enrichment, waste of corporate assets, violations of Sections 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

158.    Align is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

159.    Plaintiff is, and has been at all relevant times, a shareholder of Align. Plaintiff will adequately and fairly represent the interests of Align in enforcing and prosecuting its rights, and, to that

end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

160.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

161.     A pre-suit demand on the Board of Align is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following ten Individual Defendants: Defendants Hogan, Dallas, Lacob, Larkin, Morrow, Prescott, Saia, Santora, Siegel, and Thaler. Plaintiff needs only to allege demand futility as to five of the ten Directors who are on the Board at the time this action is commenced.

162.     Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while seven of them engaged in insider sales based on material non-public information, netting proceeds of approximately $48.7 million, while, at the same time, they caused the Company to repurchase its own stock at artificially inflated prices, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

163.     In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

164. The Directors knew of the falsity of the misleading statements at the time they were made. The sale of Invisalign products is the core operation of Align, accounting for 89% of the Company's revenues in the year ended December 31, 2017. Indeed, the Company admitted in its 2018 Q1 10-Q and 2018 Q2 10-Q that it "expect[s] that net revenues from the sale of the Invisalign System, primarily Invisalign Full and Invisalign Teen, will continue to account for the vast majority of our total net revenues for the foreseeable future."

165. As Board members of Align, charged with overseeing the Company's affairs, the Directors all must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Align, Defendants Hogan, Dallas, Lacob, Larkin, Morrow, Prescott, Saia, Santora, Siegel, and Thaler must have been aware of the material facts surrounding the changes to the Company's promotions and concomitant effect on APS and revenue.

166. Therefore, Defendants Hogan, Dallas, Lacob, Larkin, Morrow, Prescott, Saia, Santora, Siegel, and Thaler each knew of the falsity of the statements and misleading omissions detailed herein at the time such statements were made, and further failed to exercise or recklessly disregarded their duty of oversight to stop or correct such misleading statements and omissions.

167. Additional reasons that demand on Defendant Hogan is futile follow. Defendant Hogan has served as President, CEO and a Company director since 2015. Thus, as the Company admits, Defendant Hogan is a non-independent Director. He receives handsome compensation, including over $11.7 million in 2017. His insider transactions before the fraud was exposed, which yielded approximately $9.2 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. As a trusted Company director, CEO, and President, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Hogan is also a defendant in the Securities Class Actions.

Thus, for these reasons, Defendant Hogan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

168.    Additional reasons that demand on Defendant Prescott is futile follow. Defendant Prescott has served as a Company director since 2002, and previously served as its President and CEO from 2002 to 2015. Thus, as the Company admits, Defendant Prescott is a non-independent director. He receives handsome compensation, including $478,889 in 2017. His insider transactions before the fraud was exposed, which yielded over $20.7 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. As a long-time Company director and the Company's former President and CEO, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, benefits from related party transaction with the Company: as reported in the 2018 Proxy Statement, Defendant Prescott, a season ticket holder of San Jose Sharks and Golden State Warriors, received over $153,000 from the Company for tickets to those teams' games purchased from him for corporate purposes. As a result of the substantial value Defendant Prescott receives for these tickets, he is unable to evaluate a demand with independence. For these reasons, too, Defendant Prescott breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

169.    Additional reasons that demand on Defendant Lacob is futile follow. Defendant Lacob has served as a Company director since 1997. He receives handsome compensation, including $488,889 in 2017. His insider transactions before the fraud was exposed, which yielded over $12.9 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and

engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, Defendant Lacob breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

170.    Additional reasons that demand on Defendant Thaler is futile follow. Defendant Thaler has been a Company director since 2004, and is a member of the Audit Committee. He receives handsome compensation, including $497,389 in 2017. His insider transactions before the fraud was exposed, which yielded approximately $2.4 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. As a long-time Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Thaler breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

171.    Additional reasons that demand on Defendant Santora is futile follow. Defendant Santora has been a Company director since 2003, and is the Chair of the Audit Committee, and a member of the Compensation Committee. He receives handsome compensation, including $514,389 in 2017. His insider transaction before the fraud was exposed, which yielded approximately $1.8 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. As a long-time Company director, Chair of the Audit Committee and member of the Compensation Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, Defendant Santora breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

172. Additional reasons that demand on Defendant Saia is futile follow. Defendant Saia has served as a Company director since 2013, and is a member of the Audit Committee and the Compensation Committee. She receives handsome compensation, including $505,889 in 2017. Her insider transactions before the fraud was exposed, which yielded approximately $1.3 million in proceeds, demonstrate her motive in facilitating and participating in the fraud. As a trusted Company director and member of the Audit Committee and the Compensation Committee, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Thus, for these reasons, Defendant Saia breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

173. Additional reasons that demand on Defendant Larkin is futile follow. Defendant Larkin has been a Company director since 2004, and as Chairman of the Board since 2006. He receives lavish compensation, including $801,132 in 2017. His insider transactions before the fraud was exposed, which yielded approximately $396,675 in proceeds, demonstrate his motive in facilitating and participating in the fraud. As a long Company director and Chairman, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Larkin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

174. Additional reasons that demand on Defendant Morrow is futile follow. Defendant Morrow has served as a Company director since 2006, and is the Chair of the Compensation Committee. He receives handsome compensation, including $503,806 in 2017. As a long-time Company director and

Chair of the Compensation Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, Defendant Morrow breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

175.    Additional reasons that demand on Defendant Siegel is futile follow. Defendant Siegel has been a Company director since 2017. She receives handsome compensation, including $561,891 in 2017. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Siegel breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

176.    Additional reasons that demand on Defendant Dallas is futile follow. Defendant Dallas has served as a Company director since March 2018. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, Defendant Dallas breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

177.    Additional reasons that demand on the Board is futile follow.

178.    Demand in this case is excused because the Directors, all of whom are named as defendants in this action, and one of whom is a defendant in the Securities Class Actions, control the Company and

are beholden to each other. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

179.    For example, Defendants Thaler and Lacob have known each other for approximately two decades. *The New York Times* has quoted Defendant Thaler as stating: "The first day that I met Joe [Lacob], in 1998, he told me that he wanted to buy the [Golden State] Warriors" basketball team. Further, both of these Defendants have connections to the National Basketball Association. Defendant Thaler was a Director of the Cleveland Cavaliers from 1990-2005. Defendant Lacob was a minority owner of the Boston Celtics from 2006 to 2010, and has been a co-owner of the Golden State Warriors since 2010. As a result of these longstanding social and professional connections, neither Defendant Thaler nor Defendant Lacob can evaluate a demand with independence, and therefore, demand is excused as to these directors.

180.    Further, three Directors and one other Individual Defendant have connections to, and upon information and belief through, General Electric Co. ("GE"). Defendant Hogan held various positions at GE between 1895 and 2008, including as CEO of GE Healthcare Technologies from 2000 to 2008. Defendant Prescott held various positions at GE Medical Systems between 1987 and 1994. Defendant Morici held various positions at GE Healthcare, including CFO of the Diagnostic Imaging and Global Products units between 1999 and 2007. Defendant Siegel had been the CEO of GE Ventures since 2012, assuming additional responsibilities as CEO of Business Innovations in 2017. Upon information and belief, Defendants Hogan, Prescott and Siegel have social and professional connections to one another, and Defendant Morici, through their tenures at GE. As a result of these social and professional connections, and the substantial likelihood of liability that Defendants Hogan and Morici face in the

Securities Class Actions, Defendants Hogan, Prescott, and Siegel cannot evaluate a demand with independence, and therefore, demand is excused as to these directors.

181. Additionally, each one of the Directors, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by approximately $57.2 million for its own common stock during the period in which the false and misleading statements were made. The Directors, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company, and yet they approved the repurchases. Thus, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

182. Defendants Santora, Saia, and Thaler (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. Pursuant to the Audit Committee Charter, the Audit Committee Defendants' responsibilities including reviewing and assessing the adequacy of Align's system of internal controls and disclosure controls and procedures. In contravention of these responsibilities, Audit Committee Defendants permitted and/or caused the Company to issue false and misleading statements as alleged herein, and operate with inadequate internal controls. As a result of the Audit Committee's failures of management and oversight, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

183. Defendants Morrow, Saia, and Santora (together, the "Compensation Committee Defendants") served on the Company's Compensation Committee during the Relevant Period. Pursuant to the Company's Compensation Committee Charter, the responsibilities of the Compensation Committee include to "[r]eview and make recommendations to the Board annually regarding the compensation policy for the directors of and consultants to the Company." As a result of the Compensation Committee's decision to permit the Directors, including themselves, to receive excessive compensation, the

Compensation Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

184.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 10(b) and 20(a) of the Exchange Act. Seven of the Directors violated the Code by selling shares of Company stock during the Relevant Period while in possession of material, non-public information about the Company (and permitted two of the other Individual Defendants to do the same); In further violation of the Code of Conduct, the Directors failed, or caused the Company to fail, to make full, fair, accurate, timely and understandable disclosure in public communications, comply with laws and regulations, and conduct business in an honest and ethical manner, and the Directors also failed to properly report violations of the Code of Conduct. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

185.    Align has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Align any part of the damages Align suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

186.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about

whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

187.    The acts complained of herein constitute violations of fiduciary duties owed by Align's officers and directors, and these acts are incapable of ratification.

188.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Align. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Align, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

189.    If there is no directors' and officers' liability insurance, then the Directors will not cause Align to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

190.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Individual Defendants for**
### **Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

191. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

192. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Align. Not only is Align now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, the Company itself is also a victim of the unlawful scheme perpetrated upon Align by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase tens of millions of dollars of its own shares at artificially-inflated prices, damaging Align.

193. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's public statements made in press releases, conference calls, and periodic and current reports filed with the SEC.

194. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Align not misleading.

195. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Align. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the

schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

196. In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, the Individual Defendants made and/or signed the Company's Form 10-Qs filed with the SEC during the Relevant Period.

197. By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

198. Plaintiff, on behalf of Align, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for
### Violations of Section 20(a) of the Exchange Act

199. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

200. The Individual Defendants, by virtue of their positions with Align and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Align and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Align to engage in the illegal conduct and practices complained of herein.

201. Plaintiff, on behalf of Align, has no adequate remedy at law.

## **THIRD CLAIM**

### **Against the Individual Defendants for Breach of Fiduciary Duties**

202.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

203.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Align's business and affairs.

204.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

205.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Align.

206.    In breach of their fiduciary duties owed to Align, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) the Company changed its customer loyalty Advantage Program in North America at the beginning of fiscal year 2018, resulting in higher discounts for doctors; (2) the Company initiated a new promotion in Q3 2018 related to Invisalign, which was distinct from previous promotions, and therefore untested; (3) as a result of the foregoing, the Company's ASP would decline, diminishing net income and profit margins; (4) the Company failed to maintain internal controls; and (5) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

207.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

208.    In breach of their fiduciary duties, nine of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein. Moreover, while the price of the Company's stock was artificially inflated, the Individual Defendants, in further breach of their fiduciary duties, caused the Company to engage in repurchasing approximately $150 million worth of Company stock at artificially inflated prices.

209.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

210.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Align's securities, and disguising insider transactions.

211.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Align's securities, and engaging in insider transactions. The

Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

212.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

213.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Align has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

214.     Plaintiff on behalf of Align has no adequate remedy at law.

## FOURTH CLAIM

**Against Defendants Hogan, Dallas, Lacob, Larkin, Morrow, Prescott, Saia, Santora, Siegel, and Thaler for Breach of Fiduciary Duties for Causing the Company to Award Themselves Excessive Compensation**

215.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

216.     Defendants Hogan, Dallas, Lacob, Larkin, Morrow, Prescott, Saia, Santora, Siegel, and Thaler breached their fiduciary duties by improperly awarding themselves excessive compensation, thereby wasting corporate assets.

217.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

218.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Align has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

219.     Plaintiff on behalf of Align has no adequate remedy at law.

## FIFTH CLAIM

**Against Individual Defendants for Unjust Enrichment**

220. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

221. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Align.

222. The Individual Defendants, based on improper conduct, received bonuses, stock options, or similar compensation from Align that was tied to the performance or artificially inflated valuation of Align, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

223. Plaintiff, as a shareholder and a representative of Align, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

224. Plaintiff on behalf of Align has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

225. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

226. As a result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

227. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

228. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

229. Plaintiff, on behalf of Align, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Align, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Align;

(c) Determining and awarding to Align the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Align and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Align and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Align to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Align restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 11, 2019

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence M. Rosen
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

DocuSign Envelope ID: F11CA8D7-DB4D-44E0-A241-C8C74FF0DECA

<u>VERIFICATION</u>

I, Michelle Tran am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 10th day of January 2019.

1/10/2019

Michelle Tran