1  PETER B. MORRISON (SBN 230148)
   peter.morrison@skadden.com
2  VIRGINIA F. MILSTEAD (SBN 234578)
   virginia.milstead@skadden.com
3  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   300 South Grand Avenue, Suite 3400
4  Los Angeles, California 90071-3144
   Telephone:    (213) 687-5000
5  Facsimile:    (213) 687-5600

6  *Attorneys for Individual Defendants and Nominal Defendant*
   *Align Technology, Inc.*
7

8  STEPHEN J. ODDO (SBN 174828)
   soddo@robbinsllp.com
9  ROBBINS LLP
   5060 Shoreham Place, Suite 300
10 San Diego, California 92122
   Telephone:    (619) 525-3990
   Facsimile:    (619) 525-3991
11

12 MELISSA A. FORTUNATO (SBN 319767)
   fortunato@bespc.com
13 BRAGAR EAGEL & SQUIRE PC
   580 California Street, Suite 1200
   San Francisco, California 94104
14 Telephone:    (415) 568-2124
   Facsimile:    (212) 214-0506
15

16 *Attorneys for Plaintiffs*
   *Michelle Tran, Jill Dooley, and Christopher Nguyen*

17              **UNITED STATES DISTRICT COURT**

18            **NORTHERN DISTRICT OF CALIFORNIA**

19 IN RE ALIGN TECHNOLOGY, INC.      )   Lead Case No.: 3:19-CV-00202-TLT
   DERIVATIVE LITIGATION,            )
20                                   )   Hon. Trina L. Thompson
                                     )   CMC Date: August 1, 2024
21 ————————————————————————————      )   CMC Time: 11:00 a.m.
                                     )
22 This Document Relates:            )   **(1) Joint Case Management Conference
                                     )   Statement; and**
23    ALL ACTIONS.                   )
                                     )   **Separate Cover**
24                                   )
                                     )   **(2) Declaration of Virginia F. Milstead
25                                   )   and exhibits.**
                                     )
26                                   )
                                     )
27 ————————————————————————————      )
28

**1**

**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**[1]

**2**       Plaintiffs Michelle Tran, Jill Dooley, and Christopher Nguyen ("Plaintiffs"), Nominal

**3** Defendant Align Technology, Inc. ("Align"), and Defendants Joseph M. Hogan, John F. Morici,

**4** Raphael S. Pascuad, Kevin J. Dallas, Joseph Lacob, C. Raymond Larkin, Jr., George J. Morrow,

**5** Thomas M. Prescott, Andrea L. Saia, Greg J. Santora, Sudan E. Siegel, and Warren S. Thaler

**6** ("Individual Defendants"), jointly submit this statement in advance of the case management

**7** conference the Court set for August 1, 2024 at 11:00 a.m., and in response to the Court's July 3, 2024

**8** Order Denying Preliminary Approval Without Prejudice and Scheduling a Case Management

**9** Conference (ECF 54, the "Order"). This statement addresses several issues the Court raised in its

**10** prior Order to address both legal and factual misunderstandings. The parties look forward to

**11** addressing the Court's concerns at the case management conference.

**12**

**INTRODUCTION**

**13**       This case is a consolidated derivative action initiated by purported stockholders of Align in

**14** which such stockholders seek to step into the shoes of the company in order to assert claims on the

**15** company's behalf for the benefit of the company. This is not a class action lawsuit.[2] Plaintiffs brought

**16** this derivative case purportedly on Align's behalf against certain of Align's directors and officers,

**17** alleging various breaches of duties owed to Align. After nearly two years of arm's-length and hard

**18** fought negotiations, the parties agreed to a settlement of this litigation. (ECF 48 ¶¶ 8-10.) As part of

**19** the settlement, the Individual Defendants will institute or maintain certain corporate governance

**20** reforms at Align, including, among a variety of other changes, amendments to the committee charters

**21** for the Disclosure, Audit, and Compensation Committees of Align's board of directors. (ECF 48-1

**22**

---

**23** [1]       "Ex." refers to the exhibits to the Declaration of Virginia F. Milstead submitted concurrently herewith. Unless otherwise noted, all emphasis is added, and all citations, brackets, and internal

**24** quotation marks are omitted from all quoted material for ease of reading.

[2]       In a class action, the plaintiffs bring claims on behalf of absent putative class members

**25** asserting that the defendant violated the rights of plaintiffs and members of the putative class, and seek recovery for the plaintiffs and the class. By contrast, in a derivative lawsuit, a plaintiff

**26** stockholder asks the court to permit such stockholder to step into the shoes of the corporation so that the corporation can bring a lawsuit against others for the benefit of the corporation, not its

**27** shareholders. *See Quinn v. Anvil Corp.*, 620 F.3d 1005, 1012 (9th Cir. 2010). If a derivative lawsuit is successful, any recovery goes to the corporation, not to any stockholder or stockholder class. *See*

**28** *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991). The rights of absent putative class stockholders are not at issue in the case.

---

1   at 26-29.)³ These are **not** changes to Align's certificate of incorporation (colloquially known as the

2   corporate charter). In exchange, Plaintiffs agreed to discontinue this action and grant releases to the

3   parties involved. (*Id.* at 16:11-14.) Once the parties had agreed to the substantive terms of a

4   settlement, then, and only then, did the parties negotiate a limited attorneys' fee to be paid, subject to

5   Court approval, to Plaintiffs' counsel by Align's insurer. (*Id.* at 15:10-12.)

6        The basic framework of this settlement—governance reforms for the corporation and a fee to

7   Plaintiffs' counsel in exchange for a release—is common, and has been approved by countless federal

8   courts under Rule 23.1(c). *See, e.g.*, *In re Pinterest Derivative Litig.*, No. C 20-08331-WHA et al.

9   2022 WL 2079712, at *3 (N.D. Cal. June 9, 2022) (approving settlement with this structure); *In re*

10  *Oclaro, Inc. Derivative Litig.*, No. C-11-3176 EMC, 2014 WL 4684993, at *6 (N.D. Cal. Sept. 19,

11  2014) (same); *Feuer v. Thompson*, Nos. 10-cv-00279 YGR, 12-cv-0203 YGR, 2012 WL 6652597,

12  at *1 (N.D. Cal. Dec. 13, 2012) (same); *In re Rambus Inc. Derivative Litig.*, No. C 06-3513 JF (HRL),

13  2009 WL 166689, at *2 (N.D. Cal. Jan. 20, 2009) (same); *Moore v. Verb Tech. Co.*, No. CV 19-

14  8393-GW-MAAx, 2021 WL 11732976, at *2 (C.D. Cal. Mar. 1, 2021) (same); *Young v. Ault*, No.

15  CV 18-6587 PA (PLAx), 2020 U.S. Dist. LEXIS 131898, at *7 (C.D. Cal. July 14, 2020) (same);

16  *Emond v. Murphy*, No. LA CV18-09040 JAK JEMx, 2019 WL 13039332, at *2-8 (C.D. Cal. Aug.

17  27, 2019) (same); *Rommerswael v. Auerbach*, No. SACV 18-00236 AG (JCGx), 2019 WL 7753447,

18  at *2 (C.D. Cal. Jan. 7, 2019) (same); *In re OSI Sys., Inc. Derivative Litig.*, No. CV-14-2910-MWF

19  (MRWx), 2017 WL 5634607, at *2 (C.D. Cal. Jan. 24, 2017) (same); *In re Ceradyne, Inc.*, No.

20  SACV 06-919-JVS (PJWx), 2009 WL 10671494, at *2 (C.D. Cal. June 9, 2009) (same); *Basaraba*

21  *v. Greenberg*, No. CV 13-5061 PSG (SHx), 2014 WL 12586738, at *1-2 (C.D. Cal. Sept. 16, 2014)

22  (same); *Graham v. Hutcheson*, No. 08 CV 0246 MMA (NLS), 2010 WL 11484313, at *2 (S.D. Cal.

23  Sept. 22, 2010) (same); *In re Intel Corp. Derivative Litig.*, No. 09-867-JJF, 2010 WL 2955178, at *2

24  (D. Del. July 22, 2010) (same); *In re Impinj, Inc. Derivative Litig.*, No. 18-1686-RGA, 2021 WL

25  7209525, at *2 (D. Del. Nov. 22, 2021) (same); *Pfeiffer v. Alpert*, No. 10-1063, 2011 WL 13382329,

26  at *1 (D. Del. Aug. 3, 2011) (same); *Allred v. Walker*, Nos. 19-cv-10641 (LJL), 19-cv-10876 (LJL),

27  ³     Pin citations to ECF 48-1 refer to the page numbers the Clerk's office stamped on the top

28  right corner of the page during the filing process, rather than the original page numbers on the bottom
    of the document.

2021 WL 5847405, at *2 (S.D.N.Y. Dec. 9, 2021) (same); *In re Fab Universal Corp. S'holder Derivative Litig.*, 148 F. Supp. 3d 277, 280 (S.D.N.Y. 2015) (same); *Chan v. Diamond*, No. 03 Civ.8494(WHP), 2005 WL 941477, at *1 (S.D.N.Y. Apr. 25, 2005) (same); *Gantulga v. Aron*, Case No. 1:18-cv-10007-ALC et al., 2023 WL 8720129, at *3-5 (S.D.N.Y. Dec. 18, 2023) (same); *In re RTI Surgical Derivative Litig.*, No. 1:20-CV-3347 (MFK), 2021 WL 8314461, at *6 (N.D. Ill. Sept. 30, 2021) (same); *Bushansky v. Kawas*, No. C22-0497 TSZ, 2024 WL 1973279, at *2 (W.D. Wash. May 3, 2024) (same).

Because this settlement structure and approach is so common, the parties were surprised and troubled by the Court's Order denying preliminary approval of the settlement, in which the Court expressed a number of concerns about the settlement's terms. (ECF 54, the "Order.") Respectfully, as explained below, all of the Court's concerns are based on a series of misunderstandings about the terms of the Settlement Agreement, its negotiation, the law governing Align's corporate operations, and the facts.

***First***, the Court expressed concern that the Settlement Agreement called for changes to Align's governing documents without stockholder approval. (*E.g.*, Order at 4.) The Court is mistaken. While it is true that the Settlement Agreement requires the Defendants to change the charters for ***committees*** of Align's board of directors—namely, the Disclosure, Audit, and Compensation Committees—***none*** of those changes requires stockholder approval under Delaware law or Align's certificate of incorporation and bylaws. These committee "charters"—internal organizational guidelines enacted by Align's board of directors—differ from Align's corporate "charter," which is more formally known as its certificate of incorporation and foundational governing document. While Delaware law requires stockholder approval for changes to a corporation's certificate of incorporation, 8 Del. C. § 242, it does ***not*** require stockholder approval for changes to internal organizational documents like committee charters. Courts routinely approve settlements of derivative cases that include amendments to committee charters and without requiring shareholder approval. *See, e.g.*, *Rambus*, 2009 WL 166689, at *2 (granting final approval of settlement requiring "significant amendments to the Compensation Committee Charter"); *Moore v. Verb Tech. Co.*, 2021 WL 11732976, at **4 (preliminarily approving settlement requiring amendments to three committee

charters on the ground that such amendments "confer[] substantial benefits on [company] and [company]'s stockholders"); *Young*, 2020 U.S. Dist. LEXIS 131898, at *11 (granting final approval of settlement requiring amendment to Audit Committee Charter on the ground that such reform would present a "benefit"); *Bushansky*, 2024 WL 1973279, at *2 (preliminarily approving settlement requiring amendments to two committee charters).

*Second*, the Court was concerned that the release provided in the Settlement Agreement ("Release"), covered claims unrelated to this lawsuit. (Order at 6-7.) That is not correct. The Release applies *only* to claims "that (i) were or could have been asserted by Align, Plaintiffs, or any Current Align Stockholder derivatively on behalf of Align; and (ii) arise out of or relate in any way to the allegations . . . set forth in" the settled litigation. (ECF 48-1 at 6:22-7:4, 16:11-14.) The Court arrived at a contrary conclusion by reading the definition of one term ("Unknown Claims"), in isolation, rather than reading all of the various terms together as used in the Release. (Order at 7.) Only Unknown Claims "that (i) were or could have been asserted by Align, Plaintiffs, or any Current Align Stockholder derivatively on behalf of Align; and (ii) arise out of or relate in any way to the allegations . . . set forth in" the settled litigation are being released. This too is standard in derivative settlements. *See, e.g.*, *In re NVIDIA Corp. Derivative Litig.*, No. C-06-06110-SBA (JCS), 2009 U.S. Dist. LEXIS 24973, at *21 (N.D. Cal. Mar. 18, 2009) (approving derivative settlement with release of "unknown claims" that arise out of lawsuit's allegations); *Lao v. Dalian Wanda Grp. Co.*, No. 2019-0303-JTL, 2022 Del. Ch. LEXIS 448, at *9-14 (Nov. 30, 2022) (similar); *Gantulga*, 2023 WL 8720129, at *3-5 (similar); *Fulton Cnty. Emps.' Ret. Sys. v. Blankfein*, No. 19-CV-1562 (VSB), 2023 WL 350888, at *2-3 (S.D.N.Y. Jan. 20, 2023) (similar); *Emps. Ret. Sys. of St. Louis v. Jones*, No. 2:20-cv-4813, 2022 U.S. Dist. LEXIS 194642, at *20, *56-61 (S.D. Ohio Aug. 23, 2022) (similar); *Emond*, 2019 WL 13039332, at *6 (similar).

*Third*, the Court expressed concern that the parties' proposed form of notice—publishing a summary of the settlement in a press release, and linking to the settlement documents in the summary and Align's SEC filings (ECF 48-1 at 14:5-18)—was intended to hide violations of shareholder voting rights. (Order at 8-9.) Not so. As explained above and below, the Settlement Agreement does *not* call for any corporate governance reforms that implicate shareholder voting rights. Stripped of

that concern, the proposed form of notice is both ordinary and appropriate, and gives stockholders easy access to information about the settlement's terms. *See, e.g.*, *RTI*, 2021 WL 8314461, at *1 (approving similar plan of notice); *Derivatively v. George*, No. 21-82061-CV-SMITH, 2024 U.S. Dist. LEXIS 69060, at *3-4 (S.D. Fla. Apr. 15, 2023) (same); *see also Rambus*, 2009 WL 166689, at *2 (same); *Moore*, 2021 WL 11732976, at *6-7 (same); *Young*, 2020 U.S. Dist. LEXIS 131898, at *3 (same); *Synchronoss*, 2021 WL 5881638, at *3 (same).

    ***Finally***, the Court expressed concern that the Settlement Agreement's payment to Plaintiffs' counsel was the product of collusion. (Order at 9.) Respectfully, that is incorrect. As Plaintiffs' counsel declared under penalty of perjury, the parties negotiated for nearly ***two years***, and reached agreement on the proposed settlement ***before*** they agreed on the amount of compensation Plaintiffs' counsel would ask the Court to approve. (ECF 48 ¶¶ 8-10.) Plaintiffs sent a series of settlement demands to Defendants between February and May of 2022. (*Id.* ¶ 8.) Thereafter, the parties negotiated for ***more than a year***, until May 26, 2023, before reaching "an agreement in principle on the material substantive terms of a global resolution" of this litigation. (*Id.* ¶ 9.) Only after those substantial negotiations did the parties turn to the question of what fees, if any, Plaintiffs' counsel should receive in exchange for the benefits Align will receive from the settlement. The parties "commenced good-faith, arm's-length negotiations regarding an appropriate award of attorneys' fees and expenses to [Plaintiffs'] counsel," which "culminated in the Settling Parties' agreement that Align would cause its insurers to pay attorneys' fees and expenses totaling $575,000, subject to Court approval." (*Id.* ¶ 10.) In other words, the parties engaged in good-faith, arm's length negotiations— not collusion. Defendants' counsel would gladly submit his own declaration corroborating Plaintiffs' counsel's declaration.

    The Court further expressed concern that the fee award to Plaintiffs' counsel is too high, and the parties agreed to a "clear sailing provision" so counsel could seek an inflated fee award without Defendants' interference. (Order at 9.) Both points are mistaken. A $575,000 fee for achieving corporate governance reforms is reasonable, given the length of the settlement negotiations and the substantial number of Plaintiffs and counsel involved. Indeed, the fact that Align's insurers have agreed to pay the $575,000 is strong evidence that this sum is reasonable. In any event, the settlement

1   is **not** contingent on the Court's fee award. (ECF 48-1 at 15:1-12 ("The Settlement is not contingent

2   on any attorneys' fees and expenses award."); *see also* Ex. 3 at 48:15-22 (counsel explaining to the

3   Court "that the settlement is not contingent on attorneys' fees requests").)

4        Moreover, this settlement does not contain a "clear sailing provision," as that term is used in

5   the class action context. In the class action context, a clear sailing provision is a stipulation by the

6   defendant not to challenge the amount of fees the plaintiffs' attorneys seek to obtain out of the

7   compensation paid **to the class**. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 948

8   (9th Cir. 2011). By contrast, Plaintiffs' counsel here is not seeking to recover fees out of money that

9   would otherwise be paid to absent third parties. Indeed, courts routinely approve both settlements

10  and attorney fee awards with precisely the same fee provisions as in this settlement. *See, e.g.*,

11  *Rambus*, 2009 WL 166689, at *3-4 (approving agreed-upon attorney fee-and-expense award in

12  derivative settlement); *Young*, 2020 U.S. Dist. LEXIS 131898, at *12-13 (same); *Synchronoss*, 2021

13  WL 5881638, at *1, *13 (same); *Gantulga*, 2023 WL 8720129, at *6 (same); *Intel*, 2010 WL

14  2955178, at *5-6 (same); *Moore*, 2021 WL 11732976, at *2 (same); *Emond*, 2019 WL 13039332, at

15  *2 (same); *Rommerswael*, 2019 WL 7753447, at *2 (same).

16       The parties intensely negotiated the amount Align's insurer would pay to compensate

17  Plaintiffs' counsel for their efforts in this litigation, and made that fee subject to Court approval. No

18  aspect of those negotiations should raise any fears about collusion. Align is obtaining multiple

19  benefits from this settlement without paying anything out of pocket, in a context in which the

20  settlement itself is not contingent on any attorneys' fee award, and the parties heavily negotiated the

21  fee at a time after which they had already agreed to the material terms of the settlement itself.

22       For these reasons, and those below, the Court should preliminarily approve the parties'

23  vigorously negotiated Settlement Agreement as fair and reasonable. The Court should not have

24  doubts about the fairness and legitimacy of this settlement agreement. The Court should also vacate

25  its prior Order. To the extent necessary, the parties intend to submit a renewed motion for preliminary

26  approval expanding on all of these topics as necessary after the August 1, 2024 case management

27  conference.

28

# DISCUSSION

## I. The Settlement Agreement Does Not Provide for Any Corporate Governance Changes Requiring a Stockholder Vote

The Settlement Agreement requires certain amendments to the charters governing Align's Disclosure, Audit, and Compensation Committees. (ECF 48-1 at 26-29.) The Order expresses concern that these amendments "will deprive Align shareholders of their voting rights" because corporate law "requires shareholder approval to amend a corporate charter." (Order at 4, 9.)

The Court appears to have misapprehended the Settlement Agreement and the corporate law governing Align's internal operations. The Settlement Agreement does *not* call for any amendments to Align's "charter"—i.e., its foundational governing document, called a "certificate of incorporation" under governing Delaware law. Instead, it calls for amendments to the documents that organize the various internal committees created by Align's board of directors, which consist of members of management and/or the board of directors. While the law requires shareholder approval to amend a certificate of incorporation, it does *not* require shareholder approval of amendments to internal organizational documents like a committee charter.

Align "is incorporated in Delaware, and therefore governed by Delaware law." *Lee v. Fisher*, 70 F.4th 1129, 1136 (9th Cir. 2023) (en banc). Under Delaware statutory law, a corporation's foundational governing document (sometimes colloquially referred to as its "charter") is its "certificate of incorporation." 8 Del. C. § 104; *see also Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 939, 945 n.38, 948 n.55, 956 n.100 (Del. Ch. 2013) (using "charter" and "certificate of incorporation" interchangeably). The certificate of incorporation is the document "filed to create the corporation" and any subsequent documents enacted under specified statutory provisions "which have the effect of amending or supplementing" that original filing. 8 Del. C. § 104. In most circumstances, shareholder approval is required to amend a corporation's certificate of incorporation. *Id.* § 242.

By contrast, there is no provision in the Delaware General Corporation Law ("DGCL"), that requires shareholder approval of a corporation's internal organizational documents, like the documents that create board or management committees or define their responsibilities. A

corporation's right to create and amend internal organizational documents stems from its general power to "exercise all the powers and privileges granted . . . by its certificate of incorporation, together with any powers incidental thereto, so far as such powers are necessary or convenient to the conduct, promotion or attainment of the business or purposes set forth in its certificate of incorporation." *Id.* § 121(a). Put differently—whether and how a corporation can amend its internal organizational documents is governed by its certificate of incorporation and bylaws. *See Applied Energetics, Inc. v. Farley*, 239 A.3d 409, 440-442 (Del. Ch. 2020) (explaining that public Delaware corporations have the power to take any business action, except conferring honorary degrees and engaging in certain banking activities, subject to whatever limits on the authorization of that power are present in the DGCL or the corporation's governing documents).

Align's certificate of incorporation does not require shareholder approval to amend committee charters, or mention committee charters at all.[4] (*See generally* Ex. 1.) Instead, the certificate of incorporation gives its directors the authority to adopt bylaws that govern the corporation's internal workings. (*Id.* § IX.) Those bylaws, in turn, authorize the board of directors to create committees to exercise whatever "powers and authority" the board might give them. (Ex. 2 § 4.1.) They do not require a shareholder vote to adopt or amend a charter outlining the committee's powers and responsibilities. (*See id.*)

To summarize: Delaware law requires Align to obtain shareholder approval before amending its certificate of incorporation. But neither Delaware law, nor Align's certificate of incorporation or bylaws, require Align to obtain shareholder approval of changes to internal organizational documents like committee charters.

Here, the Settlement Agreement requires Align to make certain changes to the charters organizing and governing its Disclosure, Audit, and Compensation Committees. Crucially, however, it does not require any changes to Align's certificate of incorporation. Since Align's internal governing documents do not require shareholder approval to change committee charters, as opposed

---

[4]    Align's certificate of incorporation and bylaws are publicly available as attachments to its SEC filings. (*See* Milstead Decl. ¶¶ 2-3.)

1    to Align's certificate of incorporation, the Settlement Agreement does not call for corporate

2    governance reforms requiring a shareholder vote.

3         Courts routinely approve derivative settlements calling for amendments to committee

4    charters where there is no shareholder vote required for such changes. *See, e.g.*, *Rambus*, 2009 WL

5    166689, at *2 (granting final approval of settlement requiring "significant amendments to the

6    Compensation Committee Charter"); *Moore*, 2021 WL 11732976, at *4 (preliminarily approving

7    settlement requiring amendments to three committee charters on the ground that such amendments

8    "confer[] substantial benefits on [company] and [company]'s stockholders"); *Young*, 2020 U.S. Dist.

9    LEXIS 131898, at *7, *11 (granting final approval of settlement requiring amendment to Audit

10   Committee Charter on the ground that such reform would present a "benefit"); *Bushansky*, 2024 WL

11   1973279, at *2 (preliminarily approving settlement requiring amendments to two committee

12   charters); *see also Dorvit v. Winemaster*, 950 F.3d 984, 991 (7th Cir. 2020) (affirming district court's

13   final approval of settlement requiring reform of Audit Committee Charter); *Derivatively*, 2024 U.S.

14   Dist. LEXIS 69060, at *19-20 (preliminarily approving settlement requiring company to "amend the

15   Charter of the Audit Committee" and "adopt and implement" charters for Legal Steering Committee

16   and Disclosure Committee); *Synchronoss*, 2021 WL 5881638, at *9 (granting final approval of

17   settlement where company's Disclosure Committee "w[ould] be tasked with adopting a Disclosure

18   Committee Charter"); *In re Impinj, Inc.*, 2021 WL 7209525, at *5-6 (granting final approval of

19   settlement requiring amendments to company's Audit Committee Charter on the ground that it would

20   "provide a meaningful benefit"); *RTI*, 2021 WL 8314461, at *8-10 (preliminarily approving

21   settlement requiring company to "amend[]" Audit Committee Charter and "adopt a charter for a

22   management-level Disclosure Committee"); *Gubricky v. Ells*, No. 16-cv-2011-WJM-KLM, 2018

23   WL 1621166, at *8 (D. Colo. Apr. 4, 2018) (granting final approval of settlement where "the

24   Proposed Settlement requires what are, by all accounts, true amendments to Chipotle's . . . audit

25   committee charter"). These decisions do not express concern that such amendments will violate

26   stockholder voting rights.

27

28

## II. **The Proposed Release Is Not Overbroad**

The Order also expresses concern with two aspects of the release included in the Settlement Agreement (ECF 48-1 at 16:11-17:11, "Release"). Respectfully, both concerns rest on misapprehensions about the Settlement Agreement's nature and terms.

*First*, the Court notes that the Release bars Align's stockholders from bringing actions against the parties' attorneys and the Individual Defendants related to the settlement of this lawsuit, and posits that the Release "appears to be aiming to protect" these "persons from any future legal actions that could include bringing such a claim for violating the shareholders voting rights under the settlement agreement herein." (Order at 6.) However, as explained in the previous section, the Settlement Agreement does not call for any corporate governance reforms that require a shareholder vote. *Supra*, § I. Thus, the Release does not aim to insulate any person against liability for violating shareholder voting rights because shareholder voting rights are not implicated by this settlement.

Moreover, derivative settlements commonly prohibit stockholders from bringing claims against the parties' attorneys. *See, e.g.*, *Intel*, 2010 WL 2955178, at *3-4 (preventing stockholders from bringing claims against "legal representatives"); *H&N Mgmt. Grp. v. Couch*, No. 12847-VCMR, 2019 Del. Ch. LEXIS 1483, at *7-8, *10-14 (Del. Ch. Dec. 4, 2019) (same); *Frankel v. Goolsbee*, No. 10157-VCG, 2018 Del. Ch. LEXIS 1337, at *5-10 (Sept. 4, 2018) (same); *Blankfein*, 2023 WL 350888, at *3 (same); *In re Star Sci., Inc. Derivative Litig.*, No. 1:13-CV-550-AJT-JFA, 2015 U.S. Dist. LEXIS 184419, at *6-7 (E.D. Va. July 13, 2015) (same). There is nothing unusual or nefarious whatsoever about including such protections. Any implication otherwise is quite unfortunate.

*Second*, the Court also concludes that the release "is overly broad" because it extinguishes claims based on future events that are not transactionally related to the events at issue in this action. (Order at 7.) However, as the parties explained at the May 21, 2024 hearing on this matter, the Release is expressly cabined to only release claims that are transactionally related to this lawsuit. (*See* Ex. 3 at 48:4-13 (calling the Court's attention to the relevant language and explaining that the settlement releases only those claims "which were or could have been asserted by Align, and which rise out of or relate in any way to the allegations, transactions, facts, disclosures, and nondisclosures

10

1   set forth in the action").) Relevant here, the Settlement Agreement provides that as of "the Effective

2   Date, the Plaintiffs and all Current Align Stockholders will release the Released Defendant Persons

3   from the Released Plaintiffs' Claims," and Align itself will also "release the Individual Defendants

4   and their Related Persons from the Released Plaintiffs' Claims." (ECF 48-1 at 16:11-14.) "Released

5   Plaintiffs' Claims" is defined as "all claims . . . including known claims and Unknown Claims . . .

6   that (i) *were or could have been asserted by Align, Plaintiffs, or any Current Align Stockholder*

7   *derivatively on behalf of Align, and (ii) arise out of or relate in any way to the allegations . . . set*

8   *forth in the Federal Derivative Action or State Court Actions . . . .*" (*Id.* at 6:22-7:4.) "Unknown

9   Claims" is in turn defined to include claims "that any of the Settling Parties or any Current Align

10  Stockholder does not know or suspect to exist in his, her, or its favor at the time of the release of

11  such claims . . . ." (*Id.* at 7:18-8:18.)

12      Putting these definitions together, the Settlement Agreement releases any claims, whether

13  known or unknown, that could have been asserted derivatively on Align's behalf in this lawsuit and

14  that arise out of, or relate to in any way, the allegations in this litigation. This language cabins the

15  scope of the release to claims that "are born out of the same nucleus of operative fact as the underlying

16  claims." (Order at 7.)

17      Courts have routinely approved similar releases in derivative settlements. *See, e.g.*, *NVIDIA*,

18  2009 U.S. Dist. LEXIS 24973, at *19 (approving derivative settlement with release of "unknown

19  claims" that arise out of lawsuit's allegations); *Lao*, 2022 Del. Ch. LEXIS 448, at *7-14 (similar);

20  *Gantulga*, 2023 WL 8720129, at *3-5 (similar); *Blankfein*, 2023 WL 350888, at *2-3 (similar);

21  *Jones*, 2022 U.S. Dist. LEXIS 194642, at *20, *56-61 (similar); *Emond*, 2019 WL 13039332, at *6

22  (similar); *In re McKesson Corp. Derivative Litig.*, No. 4:17-cv-01850-CW, 2020 WL 13577438, at

23  *3 (N.D. Cal. Apr. 22, 2020) (similar); *In re Wells Fargo & Co. S'holder Derivative Litig.*, 445 F.

24  Supp. 3d 508, 515-16 (N.D. Cal. 2020) (similar), *aff'd*, 845 F. App'x 563 (9th Cir. 2021); *Defrees v.*

25  *Kirkland*, 2018 WL 11365544, at *1 (C.D. Cal. July 26, 2018) (similar); *Ceradyne*, 2009 WL

26  10671494, at *2 (similar).

27      The Court's contrary conclusion appears to have been based on reading the definition of the

28  term "Unknown Claims" in isolation, rather than reading it in connection with the other defined terms

1  in the Release and the Release language itself. (Order at 7.) However, when combined with the

2  Release's other defined terms, the definition of "Unknown Claims" does not purport to release claims

3  that are transactionally unrelated to this litigation.

4  **III.    The Proposed Notice Does Not Shield the Settlement's Terms from Stockholders**

5        The parties plan to give notice of this settlement to Align's stockholders by: (1) publishing a

6  summary of the settlement as a press release on a national wire service; (2) linking to a detailed

7  disclosure of this settlement in Align's next periodic filing with the U.S. Securities and Exchange

8  Commission; and (3) publishing all of the settlement documents on the investor relations page of

9  Align's website. (ECF 48-1 at 14:5-18.) The first two items will provide a link for investors to access

10  the full set of settlement documents, including the stipulation containing the Release, on Align's

11  website. (*Id.*)

12        The Order expresses concern that "material terms of the Proposed Settlement, including the

13  Compensation Committee Charter amendments, are buried at least 'two-clicks' away from the

14  'Notice' and 'Summary Notice' form, on Align's Investor Relations website or behind a paywall via

15  PACER." (Order at 9.) However, this concern is unwarranted for two reasons.

16        ***First***, the Court's concern appears to be related to its impression that the Settlement

17  Agreement is intended to surreptitiously deprive Align's stockholders of their voting rights. As

18  explained earlier, that is mistaken—the settlement does not call for any corporate governance reforms

19  that require approval from Align's stockholders. *Supra*, § I. Accordingly, the Notice does not attempt

20  to "bur[y]" any "material terms of the Proposed Settlement." (Order at 9.)

21        ***Second***, if the Court grants preliminary approval, all of the settlement documents, including

22  Exhibit A to the Settlement Agreement (ECF 48-1 at 25-29; ECF 51-1), which describes the

23  corporate governance reforms, will be posted to Align's investor relations website for the entire

24  investing public to see. The link to that website will be provided in the notice itself (ECF 48-1 at 46,

25  55), and in Align's next periodic report filed with the SEC. None of the settlement documents will

26  be behind a paywall or accessible only on PACER—they will instead be posted on Align's investor

27  relations website. (*Id.* at 14:5-18.) Thus, it is simply not true that the settlement documents will be

28

1   "buried." (Order at 9; *see also* Ex. 3 at 51:7-18 (counsel explaining to the Court that "[w]ithin 30
2   days of your preliminary approval order, we will have the paperwork up on the website").)

3       Indeed, courts routinely approve similar forms of notice to those the parties propose here.
4   *See, e.g., OSI*, 2017 WL 5634607, at *3 (approving plan of notice where defendant agreed to "cause
5   the Notice to be published" through "*Investors' Business Daily*, post the Notice and the settlement
6   terms on [defendant's] Investor Relations website," and give notice of the settlement in its "10-Q
7   filed with the SEC"); *In re Priceline.com, Inc. Sec. Litig.*, No. 3:00-CV-1884(AVC), 2007 WL
8   2115592, at *3 (D. Conn. July 20, 2007) (approving plan of notice of securities class action
9   settlement where defendant agreed, among other things, to publish the settlement notice through a
10  press release and described the settlement in its 10-Q report filed with the SEC); *see also RTI*, 2021
11  WL 8314461, at *1 (approving plan of notice where company would give notice through an SEC
12  filing, "create a link to the SEC filing on the Company's 'Investor Relations' page," and "cause a copy
13  of the Summary Notice . . . to be published once in *Investor's Business Daily*"); *Derivatively*, 2024
14  U.S. Dist. LEXIS 69060, at *3-4 (same); *Rambus*, 2009 WL 166689, at *2 (granting final approval
15  of settlement where notice was "published in a press release and carried on *Business Wire*," given
16  through an SEC filing, and "posted" on company website); *Moore*, 2021 WL 11732976, at *6-7
17  (approving plan of notice where company would give notice through an SEC filing, "post the Notice
18  and Settlement on a website, and publish a press release on *GlobeNewswire* . . . providing a link to
19  the website"); *Young*, 2020 U.S. Dist. LEXIS 131898, at *3 (granting final approval of settlement
20  where summary notice was "published via a Company press release," notice was given through an
21  SEC filing, and where the Notice and Stipulation were "posted" on Investor Relations page of
22  company website); *Synchronoss*, 2021 WL 5881638, at *3 (similar).

23  **IV.    Plaintiffs' Requested Fee Award Was Not the Product of Collusion**

24      The Order expresses concern that the settlement in this case may have been the product of
25  collusion because it contains a clear sailing provision. (Order at 9.) That is mistaken. As Plaintiffs'
26  counsel declared under penalty of perjury, the parties negotiated for nearly ***two years*** and reached
27  agreement on the proposed settlement ***before*** they agreed on the amount of compensation Plaintiffs'
28  counsel would ask the Court to approve. (ECF 48 ¶¶ 8-10.) Plaintiffs sent a series of settlement

demands to Defendants between February and May of 2022. (*Id.* ¶ 8.) Thereafter, the parties negotiated for ***more than a year***, until May 26, 2023, before reaching "an agreement in principle on the material substantive terms of a global resolution" of this litigation. (*Id.* ¶ 9.) Only after those substantial negotiations did the parties turn to the question of what fees, if any, Plaintiffs' counsel should receive in exchange for the benefits Align will receive from the settlement. The parties "commenced good-faith, arm's-length negotiations regarding an appropriate award of attorneys' fees and expenses to [Plaintiffs'] counsel," which "culminated in the Settling Parties' agreement that Align would cause its insurers to pay attorneys' fees and expenses totaling $575,000, subject to Court approval." (*Id.* ¶ 10.)

Moreover, the Settlement Agreement here does not contain a clear sailing provision, as that term is used in the class action context. In many class action settlements, the defendant agrees to pay a total sum to the class in the form of a common fund, and the plaintiff's counsel seeks a portion of that sum out of the common fund as compensation for its work on behalf of the class. A "clear sailing provision" is a stipulation in the settlement agreement "in which [the] defendant[] agree[s] not to object to an award of attorneys' fees" within a specific range. *Bluetooth*, 654 F.3d at 947. Such a provision is common and not itself illegal. *Id.* But because a clear sailing provision can be an indication that the plaintiffs "bargained away something of value to the class" in order to obtain an unreasonably high fee award taken out of the class's recovery, courts have "a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class, being careful to avoid unreasonably high fees simply because they are uncontested." *Id.* at 948.

The Settlement Agreement here does not contain a "clear sailing provision" as discussed in the class action context, particularly considering the terms of this Settlement Agreement and that this is a derivative suit, not a class action. The Settlement Agreement provides that "[s]ubject to Court approval, Align agrees to cause its insurers to pay Plaintiffs' Counsel's attorneys' fees and expenses in the total amount of $575,000," but the "Settlement is not contingent on any attorneys' fees and expenses award." (ECF 48-1 at 15:10-12.) This provision is not an agreement to avoid challenging counsel's request for fees from a common fund, where the proceeds would otherwise be distributed to absent class members, like a clear sailing provision in the class action context. Rather, it represents

1   an agreement to compensate counsel for the value of the bargained-for corporate governance reforms

2   provided in the Settlement Agreement, since Plaintiffs' counsel has no attorney-client relationship

3   with Align, and thus has no other method of obtaining compensation.

4       Notably, the Settlement Agreement does not trigger any of the concerns clear sailing

5   provisions raise in the class action context. To start, the Settlement Agreement does not raise a

6   concern that Plaintiffs' counsel has bargained away Align's interests in exchange for a higher fee

7   award. Like most corporations, Align's bylaws require Align to advance the Individual Defendants'

8   costs for defending this lawsuit, and bear ultimate responsibility for those defense costs unless the

9   Individual Defendants lose this lawsuit (and even then, the Court could order Align to pay the

10  Individual Defendants' defense costs if it determines that they acted in good faith and such payment

11  is warranted). (Ex. 2 §§ 8.2, 8.3, 8.5); *see also* 8 Del. C. § 145(b), (c).  Settling this lawsuit thus

12  benefits Align because: (i) it is obtaining corporate governance reforms; (ii) it does not have to pay

13  the Individual Defendants' defense costs to chase a far-off recovery; (iii) its management team will

14  no longer be distracted by this litigation; and (iv) it is not paying Plaintiffs' counsel's fees, which are

15  covered by insurance (ECF 48-1 at 15:10-12).  Put differently, Align is obtaining a number of

16  material benefits, and giving up only claims for which it must at least advance the Individual

17  Defendants' defense costs. That deal is not one that should raise concerns about collusion.

18      Moreover, the recovery for Plaintiffs' counsel is not unfair (Order at 9) and was heavily

19  negotiated. Indeed, the fact that Align's insurer agreed to pay the $575,000 requested by Plaintiffs'

20  counsel is strong evidence that the sum is reasonable, since the insurer surely would have objected

21  to an excessive fee. (ECF 48-1 at 15:10-12.) Further, courts have routinely approved similar

22  negotiated fee awards in similar derivative settlements. *See, e.g.*, *Rambus*, 2009 WL 166689, at *3-

23  4 (approving agreed-upon $2,000,000 attorney fee-and-expense award where settlement included

24  governance reforms); *Young*, 2020 U.S. Dist. LEXIS 131898, at *10-13 (approving "mutually agreed

25  upon" $600,000 attorney fee-and-expense award); *Synchronoss*, 2021 WL 5881638, at *1, *13

26  (approving agreed-upon $800,000 attorney fee-and-expense award); *Gantulga*, 2023 WL 8720129,

27  at *6 (approving $1,000,000 stipulated attorney fee-and-expense award); *Intel*, 2010 WL 2955178,

28  at *5-6 (approving stipulated $2,650,000 fees and expenses award); *Moore*, 2021 WL 11732976, at

*3 (approving settlement where "Defendants have agreed not to oppose an application for Plaintiff's Counsel's attorneys' fees and expenses up to $75,000"); *Emond*, 2019 WL 13039332, at *2 (approving settlement where "Defendants agreed that their respective insurers would pay $300,000 in attorneys' fees and costs to Plaintiffs' counsel"); *Rommerswael*, 2019 WL 7753447, at *2 (approving settlement providing "that the Individual Defendants must cause their insurers to pay Plaintiffs' counsel $1,175,000 for attorney's fees and expenses within 10 days of entry of judgment").

In sum, no collusion between counsel happened in this case. As Plaintiffs' counsel declared under penalty of perjury, the parties negotiated at arms' length for two years, and those negotiations culminated in a conventional settlement agreement, the basic structure of which has been approved numerous times by courts around the country. (ECF 48 ¶¶ 8-10.) Defense counsel is happy to submit a declaration as well if it will give the Court comfort that no collusion occurred.

## CONCLUSION

The Court should preliminarily approve the parties' vigorously negotiated Settlement Agreement as fair and reasonable. The Court should also vacate its prior Order. The parties will be prepared to discuss all of these issues during the August 1, 2024 status conference.


DATED: JULY 29, 2024                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                                        By:_____/s Peter B. Morrison_____
                                                        PETER B. MORRISON
                                                *Attorneys for Individual Defendants*
                                        *and Nominal Defendant Align Technology, Inc.*


                                        BRAGAR EAGEL & SQUIRE PC

                                        By:_____/s Melissa A. Fortunato_____
                                                        MELISSA A. FORTUNATO
                                                STEPHEN J. ODDO (Robbins LLP)
                                                        *Attorneys for Plaintiffs*
                                        *Michelle Tran, Jill Dooley, and Christopher Nguyen*

**FILER'S ATTESTATION**

I, Peter B. Morrison, am the ECF User whose ID and password are being used to file this Stipulation Continuing Case Management Conference. In compliance with Civil Local Rule 5-1(i), I hereby attest that concurrence in the filing of this document has been obtained from each of the other signatories.

By: /s/ *Peter B. Morrison*
Peter B. Morrison

JOINT CASE MANAGEMENT CONFERENCE STATEMENT
LEAD CASE NO.: 3:19-CV-00202-TLT